IN THE

# SUPREME COURT

OF

# OREGON.

Argued 6 April; decided 24 April, 1899.

## OSGOOD v. OSGOOD.

[56 Pac. 1017.]

| 35 | 1 |
| 38 | 171 |
| 35 | 1 |
| 43 | 528 |
| 35 | 1 |
| 48 | 473 |

1. STRIKING OUT TESTIMONY FOR LACK OF CERTIFICATE.—Testimony will not be struck out on appeal because it was not certified to by the presiding judge within ten days after the entry of the decree, as required by law (Laws, 1893, p. 26, § 2), where the testimony and exhibits are before the appellate court, and the delay has not deprived respondent of any rights on the appeal.

2. WAIVER OF OBJECTION.—Defendant's objection, made for the first time on appeal, that a supplemental complaint was filed without leave of the court, is waived by answering to the merits; it should have been made before answering by motion to strike out.

3. AMENDMENT OF COMPLAINT—CHANGE OF CAUSE OF ACTION.—Striking out of a complaint, during trial, an allegation that defendant, while engaged to marry plaintiff, falsely induced her to convey certain land to him, promising to reconvey it at her request, and substituting therefor an allegation that defendant represented to plaintiff that, if she would convey the land to him, he would pay certain taxes, hold the land as security, and reconvey on her repayment and demand, is not a substantial change of the cause of action.

4. DEED AS A MORTGAGE— EVIDENCE.—The claim made here that the deed from Mary Osgood to I. L. Osgood was in reality a mortgage is sustained by the great weight of the evidence.

5. WEIGHT OF EVIDENCE—ATTACHING CREDITOR.—The evidence concerning the knowledge of the attaching creditor about the condition of the title to the lots in question shows that such creditor actually knew of the wife's equities.

6. EFFECT OF KNOWLEDGE OF EQUITIES BY ATTACHING CREDITOR.*—An attachment cannot put a creditor in any better position with reference to the attached property than that occupied by the debtor, where latent equities in favor of third persons are known to all parties. For the attaching creditor to claim as an innocent purchaser, under such circumstances, is a fraud: *Meier* v. *Hess*, 23 Or. 599, cited; *Raymond* v. *Flavel*, 27 Or. 219, followed.

---

*NOTE.—In this connection, read Section 150, Hill's Ann. Laws: "From the date of the attachment until it be discharged, or the writ executed, the plaintiff, as against third persons, shall be deemed a purchaser in good faith, and for a valuable consideration, of the real or personal property attached, subject to the condition prescribed in the next section as to real property."—REPORTER.

From Clatsop : THOMAS A. McBRIDE, Judge.

This suit was primarily instituted for a divorce by
Mary Osgood against I. L. Osgood ; the complaint hav-
ing been filed on January 11, 1896, but service was not
had until the twenty-seventh. The complaint alleges,
among other things, that, while under engagement to be
married, the defendant induced plaintiff, by false repre-
sentations and promises, to convey to him lots 1 and 2 of
block 55 in the Town of Astoria ; that there was no con-
sideration for the conveyance ; that defendant promised
and agreed to reconvey the same at the request of plain-
tiff ; that, although such request has been made of him,
he has failed and still refuses to comply therewith, and
now threatens to sell and dispose of or incumber said
property. The defendant Osgood by his answer puts in
issue the material allegations of the complaint, and for
a further defense avers that in December, 1894, while
plaintiff was the owner of said lots, they were sold for
taxes and assessments for sewerage improvements, and,
the time for redemption having expired, plaintiff, prior
to the marriage, bargained, sold, and conveyed the same
to defendant for a valuable consideration, and that he
has expended in redeeming said lots from taxes and
assessments the sum of $350. He further avers that
they have been attached at the suit of his creditors, and
that he is willing plaintiff shall have them upon the
allowance of a divorce in his favor, in pursuance of the
prayer of his answer. A reply was filed March 9, and
on the thirtieth the plaintiff filed an amended and sup-
plemental complaint, making James W. Hare, the Sheriff
of Clatsop County, and Neustadter Bros., defendants,
wherein she states her cause of suit as in the original
complaint, and further alleges, in substance, that prior
to the commencement of the suit, but after the defend-

ants had been informed and knew that plaintiff intended to commence the same, the said defendant Osgood and the defendants composing the firm of Neustadter Bros. entered into a conspiracy for the purpose of defrauding the plaintiff, whereby it was understood and agreed that the said firm of Neustadter Bros. should commence an action against the defendant Osgood for the sum of $1,261.85, and attach the lots in question, each and all of said defendants well knowing that said lots belonged to and were the property of the plaintiff, and that defendant Osgood held the same in trust for her; that in pursuance of such conspiracy the defendants Neustadter Bros. instituted said action in the Circuit Court for Multnomah County on the thirteenth day of January, 1896, and thereafter on the seventeenth day of February, 1896, procured judgment against said Osgood, and on the eighteenth caused an execution to be issued thereon and placed in the hands of the defendant Hare, who has levied upon said lots, and is proceeding to sell the same by virtue of such execution. The prayer is for a dissolution of the marriage contract between the plaintiff and the defendant Osgood; that he be decreed to pay to plaintiff such sum as the court shall decree reasonable and just, as alimony, and be required to reconvey said lots to plaintiff; and that defendant be enjoined and restrained from selling or disposing of the same.

The defendants Neustadter Bros. answered on May 4, 1896, and, after denying the material allegations of the amended and supplemental complaint, for a separate defense set up that they instituted the action referred to in the complaint and procured the said attachment without any notice or knowledge of the alleged claim or equity of the plaintiff in said lots, and that they have and hold a valid lien thereon for the security of their claim against Osgood. For a further defense they allege that on the

twenty-eighth of December, 1894, and before her marriage, the plaintiff, being then the owner in fee of the lots, executed and delivered to Osgood, for a valuable consideration, her certain deed' of conveyance therefor, with full covenants of warranty, which said deed was duly filed and recorded in the office of the recorder of. conveyances for Clatsop County on the twenty-ninth of December, 1894, and thereafter the defendant Osgood represented and stated to them that he was the owner in fee thereof; that they relied upon such statements and representations, and entered upon business relations with him, and sold and delivered to him the goods, wares and merchandise, the consideration of which constituted the basis for the judgment recovered; that they parted with said goods, relying upon the ownership of said lots by Osgood; and that the plaintiff should not now be heard or permitted to set up her claim, or plead or prove her alleged equity in said property, as against them. It was stipulated between plaintiff and the defendant Osgood that the answer and reply to the original complaint should stand as the answer and reply to the amended complaint.

After the trial had been commenced, and before plaintiff had rested her case, she asked and was granted leave by the court to amend the supplemental complaint by striking out the allegations touching the false representations and promises of the defendant Osgood, and his acquirement of the legal title to the lots thereby, and setting up other facts, in substance as follows: That, while the parties were under engagement to be married, Osgood represented to plaintiff that there were delinquent taxes and street assessments against said lots amounting to about $300, and that, if plaintiff would convey them to him, he would pay such taxes and assessments, hold the lots as security therefor, and would re-

convey the same to plaintiff at any time on demand and payment to him of the amount so advanced ; that, relying upon such representations, she did, on the date last named, make the conveyance to Osgood, with the understanding and agreement between them that said instrument was a mortgage only, and that he would reconvey to her at any time on demand, on repayment of the amount paid for such taxes and street assessments ; that the said Osgood paid no more than $200 on account of said taxes and assessments ; and that he has received the rents and profits of said property, amounting to a large sum, the amount of which to plaintiff is unknown. The defendants Neustadter Bros. interposed an objection to the effect that it was not competent, after issue had been joined and the case practically tried, to permit such amendment ; but the court allowed it, and the complaint was amended accordingly. Thereupon it was stipulated that the new matter should be considered as denied, and the trial proceeded. A decree having been rendered in substantial accord with the complaint, the defendants Neustadter Bros. appeal.        Affirmed.

For Neustadter Bros. there was a brief over the names of *Bauer & Greene,* and *Cox, Cotton, Teal & Minor,* with an oral argument by *Mr. Wirt Minor.*

For Mary Osgood there was a brief over the name of *Fulton Bros.,* with an oral argument by *Mr. C. W. Fulton.*

Mr. Chief Justice Wolverton, after making the foregoing statement of the facts, delivered the opinion.

1.   There was submitted by respondent with the case upon the merits a motion to strike out the testimony because the same had not been certified to by the presiding judge within ten days after the entry of decree,

as required by law,* and another, to require the clerk of
the court below to certify up a copy of a *nunc pro tunc*
order entered in pursuance of the stipulation of plaintiff
and the defendant Osgood relative to the issues upon the
supplemental complaint. The latter motion will be
allowed, but the other must be overruled, as the testi-
mony and exhibits are all here, and the delay of a few
days by the trial judge in certifying thereto has not de-
prived respondent of any rights on appeal.

2. The objection is made here for the first time that
the supplemental complaint was filed without leave of
the court first had and obtained. It was by virtue of
such complaint that Neustadter Bros. were made parties
to the suit, and, if available at all, the objection should
have been made by motion to strike the complaint from
the files; but, having answered to the merits, they
waived it.

3. It is next contended that it was incompetent for
the court to permit the amendment of the supplemental
complaint at the trial, and the reason now urged is that
it completely changes the cause of suit and makes a new
case. The sole ground for the objection urged at the
time was that the request came too late for the court to
grant the leave or direct the amendment, and it may be
questioned whether the appellants can now found the
objection upon any other ground. However this may
be, we do not think that the weightier reason now relied
upon is potent for their purpose. The cause of suit, as
stated in the original and supplemental complaint, is, in
substance, that the lots were conveyed by plaintiff to
Osgood upon his promise to reconvey them at any time
she might request, and that he has refused to fulfill his
agreement in that respect. There is an element of *mala*

---

*NOTE.—See Laws, 1893, p. 26, § 2, which is an amendment of Section 815, Hill's
Ann. Laws.—REPORTER.

*fides* in the transaction, and it would seem to sound in tort; but that the transaction is the same as the one attempted to be set up by the amended supplemental complaint no one can doubt. Both complaints set up trust relations between the defendant Osgood and the plaintiff concerning the lots. In the one, he is alleged to have obtained the property through false representations that he would reconvey it at plaintiff's request; and the other, simply through representations that it was incumbered, and that, if plaintiff would convey to him, he would discharge the incumbrance and reconvey when he had been reimbursed. The allegations in either case are of the same transaction, between the same parties, and the purpose one and the same; that is, to relieve the property of the trust obligations, and to reinstate the plaintiff's legal title. In this view, the cause of suit was not substantially changed by the amendment, nor can it be considered a new case; and therefore the objection is not well assigned.

4. The main contention involves the *bona fides* of the appellants in prosecuting their attachment and the sale of the lots under execution to satisfy their demand against Osgood. The plaintiff has established by a strong preponderance of evidence the allegations of the complaint, as last amended by leave of the court. The plaintiff, her son and daughter, all testify that the conveyance was made for the sole purpose of securing the defendant Osgood in the repayment of the moneys expended and to be expended by him in relieving the lots from the burden of the taxes and assessments then impressed upon them, and D. W. Welch deposes to an admission by Osgood to the same effect. While Osgood claims that the deed was intended as an absolute conveyance, yet he says the understanding was that it was to be conditional and dependent upon the fact of the subsequent consummation

of the marriage, and that in case the marriage did not take place he should reconvey to plaintiff. This interpretation lends support to the plaintiff's understanding of the arrangement. It was shown that these lots at the time of the conveyance were worth from $2,500 to $3,000, and that at the date of the trial they were worth $2,500; that the defendant Osgood had expended in redeeming them from the tax sale, and other outlays, the sum of $308.76 only. This wide discrepancy between the value of the property and the amount expended by Osgood is a strong circumstance showing that the plaintiff did not intend to invest him with the absolute title to the lots. So we think the allegations of the complaint touching the purpose of the conveyance are fully established.

5. Now, if the defendants, Neustadter Bros., at the time of the commencement of their action against Osgood and the attachment of the lots, were cognizant of the title and equities of the plaintiff therein, they cannot prevail, as whatever rights they have secured by reason of the attachment must be held to be in subordination to the plaintiff's equities in the premises. We have the testimony of but two persons touching this phase of the controversy—Bernhardt Neustadter, and the defendant Osgood—which must be read and considered in connection with the surrounding and attendant circumstances. It seems that Osgood, prior to 1895, had incorporated a concern known as the Osgood Mercantile Company, and was the owner of nearly all the capital stock thereof; but in 1895 he began doing business in his own name, and it was in his individual capacity that the defendants Neustadter Bros. dealt with him, and sold to him the goods and merchandise for the price of which the action was begun, and the lots in question attached. The account commenced July 24, 1895, and continued until December 23 of the same year. The Osgood Mercantile Company

had acquired some lots in Astoria, and a tract of land outside, which had been deeded to it by Osgood; but the stock of merchandise had been retransferred from the mercantile company to Osgood, and this was the relative condition of the company and Osgood for more than a year prior to the attachment.

On the eleventh day of January, 1896, the defendant Osgood had a deed of assignment drawn up in Astoria, to C. L. Jacobson, a clerk then in the employ of Neustadter Bros., which embraced his stock of merchandise and the capital stock of the Osgood Mercantile Company, and possibly some other property, and was intended to transfer all his said property, except said lots, in trust, however, for the use and benefit of all the creditors of Osgood, save Neustadter Bros., who held the largest claim against him. The deed of assignment was fully executed, and on the night of the twelfth he went with it to Portland, arriving on the morning of the thirteenth, when he called upon the defendants Neustadter Bros., and related to Bernhardt Neustadter, their general manager, what he had done in the premises, and that a blank had been left for the purpose of filling in their name, if they desired to share in the property assigned, with the other creditors, and also stated that he was the owner of other property not included in the assignment, to wit, the lots in controversy. Osgood and Bernhardt Neustadter shortly after went to the office of the Secretary of the Merchants' Protective Union, with whom they conferred touching the matter. Subsequently Neustadter consulted his attorney, and as a result C. L. Jacobson accepted the deed of assignment without the insertion of Neustadter Bros.' name in the blank; and the action was commenced against Osgood upon the demand of Neustadter Bros., and, on the same day, on his return to said office, the summons and complaint were served

on him. After the assignment had been fully completed, and the attachment made, Jacobson sent a Mr. Waldman to Astoria to take charge of the store and merchandise, and a couple of days thereafter Osgood was employed, at a salary of $60 per month, to assist in the sale of the goods.

Mr. Neustadter testifies in regard to the matter, in substance, as follows : That on January 10 he sent Mr. Osgood a statement showing that his account was past due, with a request for a remittance ; that Osgood did not answer, but came to Portland later, and said he had received some letters from creditors, asking for payment of accounts past due, and that, rather than be crowded by any one creditor, he desired to arrange matters for all, and made a statement of his assets and liabilities. Neustadter, further testifying, says : "I told him that I did not think, from the statement that he then made, that that was sufficient for our claim ; he owed us $1,261.85, and I decided that I wanted additional security ; and he said he had two lots in Astoria, worth about $2,000, and he would be willing to turn those in. He said, 'There may be some objections raised.' I told him, 'All right,' we would go over to Mr. Sabin's (that was in our office); and we went over to Mr. Sabin's, and I consulted Mr. Sabin on the matter, and he thought he would take the matter under advisement. And in the afternoon I saw Mr. Greene, and consulted with him, and he thought the only way, or best plan, would be to attach the property for the purpose of obtaining additional security. I instructed Mr. Greene then to levy or attach the property in Astoria, and he done so." He further testifies in answer to interrogatories as follows : "Q. At that time, what did he say to you about his real estate or property in Astoria, if anything? A. He told me that his real estate was unimcumbered, that

he owned two lots in Astoria, that it was unincumbered, and that there was no indebtedness thereon whatsoever. Q. Had he ever prior to that time stated anything to your firm about these lots? A. No, sir. Q. Did you at that time, or did you before that time, know anything about his claiming to own these lots? A. Yes, sir; I knew it by his personal, verbal statement that he made that he owned two lots, and also through the mercantile agency. I had a report on the financial standing of Mr. Osgood from the mercantile agency, and that report stated that he owned, among other property, two lots in Astoria. Q. You say Mr. Osgood said to you at that time that he would be willing to give you security on the two lots, but there would be objections made to it. Did he say who would make the objections? What did he say about that? A. I told him, if there was any objection by any one, that I would prefer that he wouldn't talk about the matter. Q. Did he say his wife would not sign a mortgage on the lots? A. Yes, sir. Q. What else was said about that, if anything? A. There was nothing of any nature said in this matter whatsoever, excepting— We had very little conversation on the matter, and I told him I desired to know but very little of his domestic affairs; that he had come to Portland on a business proposition, and all we desired,—if he had any trouble with any of the creditors, that we desired protection in the matter.'' He then states that it is not true that he entered into any conspiracy or scheme with Osgood to levy on the lots in question, as alleged in the supplemental complaint, and that his only purpose in such levying was to protect their claim.

On cross-examination, he testifies as follows: ''Q. You say that when you asked him if he had any other property, he said he had two lots, but there might be objections to this; he was willing to deed them, but there

might be objections to his deeding them or mortgaging them to you? A. Likely his wife wouldn't sign them. Q. He said that? A. No, sir; that was my opinion. Q. There might be objections? A. Yes, sir; but he didn't say who. Q. Then you told him if there was liable to be any objection, you would rather he wouldn't talk to you about it? A. Yes, sir. Q. Why did you say that? A. I didn't desire to know anything at all of his domestic affairs. Q. You didn't want him to tell you who the party was that would be liable to object, did you? A. No, I didn't. Q. You were wanting to get security for your claim? A. Yes, sir. Q. But, when he told you that there was liable to be objection to his deeding them to you, you told him that if there was, you would prefer he wouldn't talk about it? A. Yes, sir. Q. Now, this is what was the matter, wasn't it, Mr. Neustadter : That you didn't want to be placed in the position of having notice of the claim of anybody else? You wanted to keep yourself in a position so that you couldn't say you knew anything about anybody else's claim? A. Yes, sir. Q. You wanted to keep yourself in a position so that you would not know anything about any claim that she had? A. Yes, sir." Later on he says that he did not know that she had any claim, and when interrogated critically about what knowledge, if any, he had of such claim, testifies positively that he was entirely without any knowledge or intimation that she had any equities or rights whatever in the property; that he had no knowledge that Osgood intended to, or was going to, make the assignment to Jacobson until he came to Portland with it, and that the suggestion of the assignment to Jacobson came from Osgood; that the assignment did not provide for the claim of Neustadter Bros., and the reason why they did not put their claim in the assignment was because it was not adequate to satisfy their entire indebted-

ness.  He further testifies that Osgood telegraphed for Jacobson to come down in October, 1895, and that Jacobson then had a conversation with Osgood, which was related to the witness upon his return, whereby Osgood assured Jacobson that if he had any trouble whatever, Neustadter Bros. "would be pretty well taken care of," and that after the conversation with Jacobson in October they sold goods to Osgood in reliance on his ownership of the lots in controversy.

Osgood testifies to the transaction substantially as related by Bernhardt Neustadter.  He says, in substance, that he made statements touching the ownership of the lots to the commercial agencies and to Neustadter Bros. in October, 1895, and again to Neustadter Bros. at the time he put up the property in trust for the benefit of his creditors ; that he had a dispatch from an eastern firm, saying they would draw on him for $5,000 if their claim was not paid ; that Neustadter Bros. sent a man down in October, whom he told at the time that he owned the lots free from all incumbrances ; that on the morning of the eleventh of January he received a letter from Neustadter Bros., asking for money, and he went through his books, and found he owed about $5,000, which would be due and payable in March, so he made the transfer ; that he told Neustadter Bros. he had included all his creditors, excepting them, and was willing to include them ; that Mr. Neustadter said he did not consider the merchandise sufficient for the protection of all his creditors ; that he told Mr. Neustadter his wife had left him in December, and she might make trouble, and Mr. Neustadter said he did not want to hear about that part of it ; that he was to call at the office of the Secretary of the Merchants' Protective Union at 4 o'clock, and when he went there an attachment was served on him.  Literally speaking, he says later :  "I consulted with this confi-

dential clerk [meaning Jacobson] in October, when he was here, when he wanted me to transfer it; and I showed then to him the state of my affairs on account of these eastern people, and told him, if I had to do it, I would do so, and, according to the understanding I had that day, I did." On redirect examination he testifies as follows: "Q. You then, before you saw Neustadter Bros., went and made a trust deed, by which you conveyed all of your property, excepting lots 1 and 2 in block 55, to a trustee for the benefit of all your creditors excepting them, and that trustee was a man employed in their store? A. That is what I said,—that he was the party that was down here before. Q. Why, before consulting them, did you make the transfer of all of your property, for the security and benefit of your other creditors, to a trustee who was in the employ of them,— one of their clerks,—without including them? A. For the very reason I stated when he was down here in October: I wanted to turn it over then to protect them against these eastern parties." The witness further testifies that he saw Neustadter Bros. first because they were the principal creditors concerned, and that they afterwards saw the Secretary of the Merchants' Protective Union as to the other creditors; that he had never at any time informed Neustadter Bros. of any interest or claim his wife had or made to the lots in question, and that, so far as he knew, they were entirely innocent of any knowledge of her claim and demand as set up in the complaint.

We are satisfied, from the particular methods employed and adopted by the parties as a means to the accomplishment of the alleged purpose they had in view, and from the manner of the testimony they have given touching the transactions, that Neustadter Bros. not only had notice of facts and circumstances of such nature as put them

upon their inquiry regarding the interest and equities of
the plaintiff in and to the lots, but that they had actual
knowledge thereof prior to the commencement of their
action against Osgood, and the attachment of the prop-
erty. Almost from the time of the marriage between Os-
good and wife they got along together badly, and during
the summer months, and in September, their domestic
tribulations were accelerated to such an extent that it
had become apparent they could not much longer live to-
gether; and it was in the October following that Jacob-
son went to Astoria in answer to a telegram addressed to
Neustadter Bros. New York creditors had written Os-
good for payment upon demands past due, which was
the prime cause of sending the telegram. At this time
it seems that an understanding had been reached that
Neustadter Bros. "would be pretty well taken care of."
Without further converse between the parties, so far as
the record shows, Osgood had the deed of assignment
drawn up for the benefit of all his creditors, excepting
Neustadter Bros., and included therein all his property
except the lots in controversy. True, he told Bernhardt
Neustadter when he went to Portland that he had left a
blank in the instrument, wherein their firm name could
be inserted, if they desired to share with the other cred-
itors; but they concluded that the security was not suf-
ficient for all. The idea of including the lots in the
assignment seems not to have been talked of. Bernhardt
Neustadter said he told Osgood that, from the statement
he had made, he did not think there was sufficient mer-
chandise to satisfy their claim, and that they wanted ad-
ditional security; so he concluded, after taking advice,
that they would not participate in the assignment, but
would attach the lots—just the course, it would seem
from Osgood's acts, that he purposed they should take.

The most singular coincidence of the transaction is

that the assignment was made to a trusted clerk of Neustadter Bros.,—a person in their employ and under their direction. Virtually, they acquired entire control of all the property of Osgood, except the lots, through the assignment; and yet they assert that they neither had nor acquired any interest therein by reason of the trust relations created by the deed. Further than this, when Jacobson assumed control of the stock of merchandise, Osgood was at once employed to assist in the sale thereof, at a salary of $60 per month. Now, if we read the testimony of Bernhardt Neustadter in connection with this plan or scheme thus adopted by the parties for providing Neustadter Bros. and the other creditors with security for their demands, wherein he says, "I told him (Osgood), if there was any objection by any one, that I would prefer that he wouldn't talk about the matter," and his equivocal statements about the source and nature of the supposed objections to deeding the lots, the conclusion is almost irresistible that he knew of the equities, and even the exact claim, asserted to the property by the plaintiff. It is more reasonable to suppose that Osgood had made a full statement of the whole matter to the representatives of the firm, and that the particular course was pursued in the light of that knowledge.

6. The knowledge of Neustadter Bros. touching the plaintiff's equities in the lots makes them guilty of bad faith in the attachment thereof: *Rhodes* v. *McGarry*, 19 Or. 222 (23 Pac. 971); *Meier* v. *Hess*, 23 Or. 599 (32 Pac. 755). We said in *Raymond* v. *Flavel*, 27 Or. 219, 241 (40 Pac. 158), that: "If a person has actual knowledge of latent equities, and purchases notwithstanding, the presumption of *mala fides* is irresistible, or, rather, he takes the estate laden with the equities, and stands in no better position than his grantor. The attempt to

claim as an innocent purchaser is the fraud of which the equitable owner may complain.'' It is evident that the credit given by Neustadter Bros. to Osgood was not based on his ownership of the lots, because they only claim having knowledge of the title standing in his name in October, and the major.part of the account had then been contracted.

The court below did not find that Osgood had been reimbursed from the rents and profits for his outlay in the payment of taxes and assessments, but it allowed to plaintiff the excess of such payments as alimony, and directed a reconveyance. This appears to be equitable, in view of the testimony, and the decree of the court below will therefore be affirmed.    AFFIRMED.