## SUPREME COURT.

AMANDA M. MYER, survivor, &c., agt. E. G. WHITAKER and
J. FINGER.

*Water — property in — Right to dispose of ice made from waters of a pond.*

The ponder of waters has a right to make any use thereof which is not
  inconsistent with the rights of owners below. This right of use which
  may be to propel machinery, for domestic purposes, for sale and for
  hire, is *property* of which the owner cannot be deprived.
So long as owners below are not interfered with a party who is the former
  and owner of the pond or basin which holds the water has the right to
  use such water for his own profit. He can use its momentum to propel
  machinery and let that right to others; he can use the water for domes-
  tic and farming purposes, and can let, rent and sell that right to others.
The right to use and to sell the water in its *liquid form* is only a part of
  his right. The *ice* made from the waters of the pond is so far the abso-
  lute *property* of the owner of the pond that he can sell or dispose of it
  as he could the trees or timber on his farm.
The case of *Marshall* agt. *Peters* (12 *How.*, 218) commented on, and the
  doctrine therein announced dissented from.
One S., at the time of the occurrence of the events out of which this suit
  originated, was and is now the owner of the land upon which the dam
  rests, and also was the owner of all the land covered by the waters of
  the pond, except a small part which belonged to O. O., by deed, con-
  veyed to the grantor of S. "the right, privilege and liberty to overflow
  so much of the said lands above mentioned as are now, or at any time
  after may be, overflowed by means of the said dam, or by any other
  dam which may be erected in place of said dam." In February, 1876,
  M. and R., of which the plaintiff is the survivor, purchased all the
  ice in the pond, formed or to be formed, from S. Previous to the
  gathering of the ice from the pond a freshet occurred which carried
  out of the pond a large part of the ice formed therein and loosened
  that which is in controversy in this action from the shore, and would
  probably have swept this out also had not plaintiffs, by holes cut
  therein, fastened it to the shore and thus detained it. After plain-

Myer agt. Whitaker.

tiffs had commenced to remove and gather the ice, the defendants went to the part of the pond, over O.'s lands, by permission of O. and cut a large quantity of ice thereon against the forbidding of the plaintiffs, and in spite of such forbidding opened a canal or channel across the pond, and over that part of it which was upon the land to which S. had title, and floated the ice, so cut by them, through such canal or channel, and gathered and sold the same.

*Held*, that, an action for the recovery of the value of the ice so taken, could be maintained upon the ground alone, of the abstract right of the plaintiffs, obtained by the purchase from S.

*Held, further*, that, as after purchase the plaintiffs had, by their own exertions, saved the ice from being lost by anchoring it to the shore, and by labor performed thereon, they were in actual possession when the defendants took and converted it, and are, therefore, entitled to recover.

*Ulster January Circuit*, 1878.

*Peter Cantine*, for plaintiff.

*Theodore B. Gates*, for defendants.

WESTBROOK, *J.* — This action, which was one for the recovery of the value of certain ice taken from a pond caused by a dam across the Esopus creek, in the town of Saugerties, Ulster county, was a trial by the court without a jury. On such trial the following facts were established:

The Esopus creek is a natural running stream of water emptying into the Hudson river, at Saugerties, aforesaid. About the year 1826 or 1827, a dam twenty-eight feet in hight was built across it and has ever since been maintained, which ponds and flows back the waters of the stream. One Joseph B. Sheffield, at the time of the occurrence of the events out of which this suit originated, was and is now the owner of the land upon which the dam rests, and also was the owner of all the land covered by the waters of the pond, except a small part thereof, which belonged to the Overbagh family. That family, however, by deed dated April 24, 1841, for the consideration of $5,750, had conveyed to the grantor of Sheffield "the right, privilege and liberty to overflow so much of

the said lands, falls and water privileges above mentioned as are now, or at any time hereafter may be, overflowed by means of the said dam across the Esopus in the year above mentioned, or by any other dam which may be erected in place of said dam." The recitals in the deed show that the dam was erected during the years 1826 and 1827, and the waters by means thereof had overflowed the lands of the grantors, and rendered valueless to them certain falls in the stream.

In February, 1876, the firm of Myer & Rosepaugh, of which the plaintiff is the survivor, purchased all the ice in the pond, formed and to be formed — there being some reservations which are not material to be stated — from Joseph B. Sheffield.

Previous to the gathering of the ice from the pond, a freshet occurred in the Esopus creek, which carried out of the pond a large part of the ice formed therein, and loosened that which was in controversy in this action from the shore, and would, probably, have swept this out also, had not the plaintiffs, by holes cut therein, fastened it to the shore and thus detained it.

Ice during the winter of 1876 was comparatively scarce and valuable. The plaintiffs had a contract for all the ice in the pond at one dollar and seventy-five cents per ton stacked, and the cost of stacking and cutting was about half that sum, leaving a profit of eighty-seven and a-half cents per ton.

After the plaintiffs had commenced to remove and gather the ice, the defendants went to the part of the pond over the Overbagh lands, by permission from such family, and cut a large quantity of ice thereon against the forbidding of the plaintiffs, and in spite of such forbidding opened a canal or channel across the pond, and over that part of it which was upon the land to which Sheffield had title, and floated the ice so cut by them through such canal or channel, and gathered and sold the same in the New York market. For the value

of the ice so taken by the defendants a recovery is sought in this action.

As the firm of Myer & Rosepaugh, of which plaintiff is the survivor, claims under a purchase from Joseph B. Sheffield, the first question which this case presents is : What right of property, if any, did Sheffield have in the ice cut and removed by the defendants? The water from which the ice was formed was ponded and gathered by him for his own use. He owned the dam which ponded and held them, which was located upon his own property. All the land under the water of the pond was his, except a small part thereof owned by the Overbagh family, and upon and over that part of the land he held, by purchase, as the owner thereof, the right to flood and to hold the water. In a basin then, formed mostly out of his own land and in part out of the land of another, the right to use which for that purpose had been purchased for a valuable consideration from the owner, Mr. Sheffield had gathered a large body of water for his own use and benefit. The manner of its use and the mode of its application to his own use, was not restricted by any deed, conveyance or title which he held, nor by any rule of law except the general one, that the flow of a natural stream shall not be so obstructed as to deprive owners below of the beneficial use and enjoyment of the stream and its flow. So long as such owners below were not interfered with, Mr. Sheffield, as the former and owner of the basin which held the water, had the right to use such water for his own profit; he could use its momentum to propel machinery and let that right to others ; he could use the water for domestic and farming purposes, and could let and rent that right to others. All these consequences follow, it seems to me, from his act of appropriation and gathering them. The land, basin or vessel which held them, was his as owner in fee or as owner for use. By his dam he had filled that basin or vessel, and the water thus gathered or held therein was his, subject only to the exception that the beneficial enjoyment of owners below should not be inter-

fered with, just as much as if he had gathered them for his own use and benefit into a tank or cistern which had been constructed for that purpose. The right to use and to sell the water in its *liquid* form is only a part of his right. When the form of the water changed by cold into *ice*, Mr. Sheffield had, it seems to me, the right to use it in its congealed form, and the same right to sell it and permit it to be gathered before it returned to its liquid state, as he had to use and dispose of when in the latter condition. There can be no difference as to his rights growing out of the state of the water. All this appears so elementary and clear, and so plainly deducible from principles long established as to be scarcely worthy of argument, were it not for the case of *Marshall* agt. *Peters* (12 *How. Pr. R.*, 218), upon which the defendants rely. In that case, which was very similar to this, judge EMOTT, for whose learning and integrity I have a profound respect, held that the party purchasing ice from the owner of a pond, could not have an injunction against a trespasser who undertook to remove it. If the refusal to allow the injunction to continue had been put upon the ground that the plaintiff had an adequate remedy at law, and the insignificant value of the ice in controversy, the decision would not apply to the case before us. The learned judge, however, goes further and states principles and reasons for his conclusions, which, if they are sound, control this cause. Examination and reflection compel me to dissent from the opinion rendered in the case cited, and the reasons therefor will now be stated.

The judge (*pages* 222, 223), says: " But it is quite as far from being true, that Mr. Lent is the owner of the water in this pond, or that it, or the ice formed from it, is his absolute property. The water in a running stream can never become, in any such sense as was claimed on the argument, the property of a riparian proprietor even if he owns both banks and the stream passes through his lands. All the property that a man can acquire in flowing water is a right

to its use.  He may have a certain right of property in it, but the water itself is not property.  He has a right to its natural flow and to use it for his cattle or his household, or upon his mill-wheels.  But he cannot stop its current nor direct its flow, nor increase or diminish it in any appreciable quantity.  He must allow the waters to pass out of his hands as they enter them, and his only right is a right to use them as they flow."

The error, with deference it is said, which the learned judge makes, is the overstatement of a general proposition and the want of a proper application of certain qualifications, the existence of which he recognized, to the general rule which he asserts and upon which his decision is founded.  It may be true, as he says, that the possessor of the mill-pond is not the " owner of the water," and that the same is not " his *absolute* property," provided, the judge means that the owner of the pond does not own absolutely and exclusively *all* the water therein.  This, of course, must be true, for if it were not the riparian owner above could use the entire water of the stream, and thus prevent its natural flow and beneficial enjoyment by the owners below.  It is also, however, true, and this the judge admits when he says, " he may use it for his cattle or his household, or upon his mill-wheels," though he fails to give it weight, that the owner has the absolute property in the use of the water as it flows, not only in the application of its momentum, but also in its removal from the stream for consumption, provided, the usefulness of the stream to the owners below is not impaired.  And it follows from this concession, because it is one of the rights of absolute property, that if such ownership as has been described is in one man, that he may convey the right he thus owns to another, the buyer taking it with the same limitations, that the title which he acquires to the water — liquid or solid — is subordinate to the rights of owners below, which must not be interfered with.  To this extent then, there is absolute ownership in water — or its use, if that expression be pre-

ferred — which the learned judge concedes. Having made this concession, it seems to me that his statement, that there can be no " absolute property in the water of a pond, 'or the ice formed from it,' " is too broad if applied to all the water, and is not limited in meaning, as the judge, in his general argument, seems to admit. It is too broad because the right to use the water for domestic purposes, or to sell it for his own profit, and take it from the pond, and from the general flow for these purposes, subject only to the exception in favor of owners below, before stated, being conceded, it follows that the owner has some absolute property in the water — in its normal state or when frozen — which he needs, and which is capable of being enforced against one, who, without right, deprives the owner of its use or of his gains from a sale. If as against such owner and his needs, the stranger can take some, he may take all, and the ponder of the waters would have no rights which the law can protect. If the judge had borne more clearly in mind the extent of absolute property in water which may exist, and of his concessions, he could not have held that the congealed water, which the owner needed for his own profit, and which did not interfere with the natural flow of the stream, nor with the beneficial enjoyment thereof by riparian proprietors below, could be removed by a mere naked wrong-doer at pleasure. This conclusion I regard as unsound, and is entirely at war with other adjudications and principles which will now be referred to.

In *Mill River Wollen Manufacturing Company* agt. *Smith* (34 *Conn.*, 462) it was held: " That owners of the waters of a mill pond, *own the ice formed upon it*, and the riparian proprietors had no right, as owners of the soil, to remove it."

In the *State* agt. *Pottmeyer* (33 *Indiana*, 402 ; *also reported in* 5th *American Reports*, 224) it was held: "When the water of a flowing stream, running in its natural channel, is congealed, the ice attached to the soil constitutes a part of the land, and belongs to the owner of the bed of the stream, and has the right to prevent its removal." This case is worthy

of attention, because it was most carefully considered and elaborately discussed. It had been to the supreme court of Indiana once before, upon the quashing of the indictment. The court then held the indictment good, because the ice might have been taken from a pool upon the land of the owner, and therefore refused to consider or decide whether there could be property in ice formed in a running and unnavigable stream. Upon the trial of the indictment, the court below held there could be no property in ice formed in a running stream. The court above held the contrary, and reversed its judgment (*See an article upon this case in Albany Law Journal, vol 3, page 386*).

In *Elliott* agt. *The Fitchburgh Railroad Company* (10 *Cushing*, 191), in *Brown* agt. *Brown* (30 *N. Y.*, 519) and in many other cases, it has been held that the ponder of waters has a right to make any use thereof which is not inconsistent with the rights of owners below. The effect of this doctrine, which is identical with that stated in the beginning of this opinion, is, that this right of use, which may be to propel machinery, for domestic purposes, for sale and for hire, is property of which the owner cannot be deprived by a mere wrong-doer. If owners below are interfered with, they will be protected against the improper or wasteful use of the water by the owner above, but as against all others who are strangers to those rights, the owner of the pond will be protected in the enjoyment of the use of the water, whether it be carried to his mill to propel his machinery, to his house, or barn for consumption, or to the property of others to whom he sells or lets it for like use, and this right of use of the water is without regard to its state or condition. It might as well be said that its use is confined to the frozen state entirely, as to say it is confined to the liquid solely. This principle, so long and well settled, must control this cause.

The only seeming difficulty which this case has presented to my mind, grows out of the fact that the ice in controversy was taken from that part of the pond which was above the

lands of the Overbagh property, the owners of which gave permission to the defendants to do the acts complained of. Reflection, however, satisfies me that this fact cannot prevent a recovery, because,

First. The defendants not only removed ice from that part of the pond which was upon the Overbagh land, but against the forbidding of the plaintiff they cut a channel across the entire pond, thus removing and destroying ice which was formed in that part of the pond which was upon the Sheffield property, and for the ice thus destroyed at least there must be a recovery.

Second. By the conveyance of the Overbagh family, the right to flow back the waters, and hold them in the pond for the benefit and use of the owner thereof is transferred, and that right Mr. Sheffield now has.   There was no limitation whatever upon the use to which the ponder could put the waters, nor any reservation whatever to the Overbagh family in the water.   In short, the effect of the Overbagh deed was to enable the owner of the right, by a dam, to make a large basin to hold water for his own use and purposes.   Whatever rights, if any, which the Overbagh family had, or retained in the water, were subordinate to those of the owner of the right to pond.   Being subordinate to those rights, the owner of the pond having need of so much thereof as was frozen, and such use being consistent with his ownership, as we have endeavored to show, no act or consent given by any of the Overbagh family could deprive the owner of the ponded water of the use to which he had applied it.   This very principle is decided in *Mill River Woolen Manufacturing Company* agt. *Smith* (10 *Conn.*, 462), before cited, in which it was held that the owner of the pond as against the owner of the land, could prevent the removal of the ice.   If it can be done because the owner needs the water in its liquid form, it can be done when the owner requires and needs it in its congealed form.   The right to pond being for an unspecified purpose, its right of use and its manner of use depend upon

Myer agt. Whitaker.

the needs of the owner, to which all other rights are subordinate.

The cause has thus far been considered upon the abstract right of the plaintiff obtained by the purchase from Sheffield, and our conclusion is that the action can be maintained upon that ground alone. There is, however, another view which is worthy of attention. After the purchase, Myer & Rosepaugh, who were the original plaintiffs (and to all their rights the present plaintiff as survivor succeeds), by their own exertions in a freshet had saved the ice in controversy from being lost. By anchoring it to the shore and by labor performed thereon, they were in actual possession when the defendants took and converted it. If, with the consent of Mr. Sheffield, the plaintiffs had taken from the pond a quantity of its water, and being in actual possession, the defendants had deprived them of it, could the plaintiffs have recovered? And when a part of the water has assumed the form of ice, and is thus separable from the rest of the water, and in that form capable of being possessed and held — is in fact thus held and possessed and retained in position for removal — can such possession be taken from them and they be remediless? That which was thus possessed by them and taken from them by others was valuable and can be recovered for, though it still lay in the pond where they had secured it for removal and stacking, though it had not yet been actually removed or stacked. All the possession which could be taken had been taken, and what had been was so marked and visible, and exercised over and towards property capable of actual possession, that in such possession the plaintiffs should be protected.

The conclusion is that the plaintiff is entitled to judgment. The plaintiff's attorney will prepare findings which will be settled on notice.