(43 App. Div. 215.)

SLINGERLAND v. INTERNATIONAL CONTRACTING CO.

(Supreme Court, Appellate Division, Third Department. September 6, 1899.)

1. WATERS—DEED—PROPERTY CONVEYED.
    Where the description in a deed includes creeks and other waters within the limits of the grant, but includes no part of the Hudson river, a navigable stream, and is followed by the words, "Together with, all and singular, ponds, pools, waters, water courses, and streams of water and fishing, within the limits and bounds aforesaid," the grant conveys no exclusive right of fishery in such river.

2. GRANTS OF PUBLIC PRIVILEGES—CONSTRUCTION.
    Public grants of public privileges are construed most strongly against the grantee.

3. FISHERY—RIGHT PRESUMED FROM USE.
    As there is no statute authorizing the state to grant an exclusive right of fishing in any of the navigable streams of the state, except as to shell fish, such right cannot be presumed, by any exclusive use, to have been granted by the state.

4. SAME—CLAIM BY PRESCRIPTION—ADVERSE POSSESSION.
    Plaintiff in an action for trespass for destroying his right of fishery owned lands adjoining the Hudson river. The grant conveying such lands did not give an exclusive right of fishing in the river, but plaintiff and his grantors for 50 years had exercised and claimed the exclusive right of fishery, which in the main was respected by his neighbors. Held, that the claim to an exclusive right of fishing was not such as to constitute an adverse possession, within Code Civ. Proc. §§ 362–372, relating to the time of bringing actions for the recovery of real property, and entitled plaintiff to damages for destruction of his alleged right by a government contractor dredging said river.

5. SAME—POWER TO GRANT EXCLUSIVE RIGHT OF FISHERY.
    Under Const. art. 3, § 18, forbidding the granting of any franchise except to promote the public welfare, an exclusive right to one person of fishing in any part of the Hudson river cannot be granted.

6. SAME—SUFFICIENT NOTICE TO CHARGE STATE.
    The fact that plaintiff and his grantors for 50 years claimed the exclusive right of fishing in the Hudson river opposite his uplands, and that in

the main his neighbors respected the claim, is not sufficient to charge the state with notice of the necessity of protecting its title.

**7. NAVIGABLE WATERS—RIGHT OF RIPARIAN OWNER TO ICE.**

Under Laws 1895, c. 953, providing that the owners or lessees of lands and ice houses on the Hudson river shall have the exclusive right of gathering ice formed on the river adjacent to the lands and ice houses, after performing certain acts of appropriation, an owner of lands adjoining said river, though he has no ice house, and therefore no existing ice privileges, has the privilege of acquiring them, and is entitled to damages for any impairment of such privilege.

**8. TRESPASS—ADMISSIBILITY OF EVIDENCE.**

In an action to recover damages for trespass, where the amount of damages is not shown in respect of the items for which damages are recoverable, testimony offered by plaintiff tending to show damages for items both recoverable and nonrecoverable is properly excluded.

**9. NAVIGABLE WATERS—IMPROVEMENTS—COMPENSATION FOR CONSEQUENTIAL INJURY.**

Where dredged material in the making of an improvement in the Hudson river under contract with the United States government is deposited along the shore on lands under water and adjacent to uplands, the owner of such lands is not entitled to compensation for consequential damages to riparian and water rights resulting therefrom.

**10. COSTS—PARTY ENTITLED.**

In an action for damages for trespass on plaintiff's land under water in the Hudson river, and for impairment of his navigable access to his uplands, where the question was whether plaintiff's easement of right of way to and from his uplands by water was appurtenant to such land, and whether his ownership of the lands under water was absolute, or so qualified as to preclude him from complaining if the government deposited dredged material thereon, title to real estate is involved, and plaintiff, on the rendering of a final judgment in his favor, is entitled to costs, under Code Civ. Proc. § 3228, providing that in an action in which a claim of title to real property arises on the pleadings, or is certified to have come in question on the trial, the plaintiff is entitled to costs on the rendering of a final judgment in his favor.

Appeal from trial term, Albany county.

Action by Cornelius H. Slingerland against the International Contracting Company for trespass. There was a judgment in favor of plaintiff, and both parties appeal. Affirmed.

For former report, see 59 N. Y. Supp. 860.

This is a common-law action to recover damages for the continuing trespass of the defendant in unlawfully dumping material dredged from the channel of the Hudson river into the waters of the river along the shore and adjacent to the uplands owned and occupied by the plaintiff. The complaint alleges that the plaintiff is the owner of the lands situated in the county of Albany, in the town of Coeymans, and having a frontage on the Hudson river of some 2,200 feet, and of a certain piece of land under water adjacent to said uplands under and by virtue of a patent from the state of New York; also that he is the owner of a free or several fishery along the shore adjacent to his uplands, and has the exclusive right to fish therein; also that he has the right to gather ice adjoining and abutting his property, and to free and unimpeded access to the navigable waters of the Hudson river. He also alleges that he is the owner of agricultural lands on an island lying on the opposite or east side of the Hudson river. Plaintiff claims that by reason of the acts of the defendant in dumping the material as above stated his freehold has been damaged, his fishing rights destroyed, his ice rights destroyed, his access to the navigable waters of the Hudson materially impeded, and his right to the unimpeded flow of the stream by his frontage, and his usufruct of the same, materially damaged, for which damage he claims $50,000. The defendant denies that the plaintiff had any exclusive ice or fishing rights, or any

right of access by the river to his lands except subject to interference by the improvement thereof, and pleaded a justification of the acts complained of under authority of the state of New York and of the federal government of the United States.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

H. A. Peckham and G. Herbert Cone, for plaintiff.
J. N. Fiero, for defendant.

LANDON, J. The learned trial court, in directing a verdict in favor of the plaintiff for six cents, in effect found the fact to be that the defendant had deposited the material which it dredged from the river channel in such places in the river as to impair the usual facilities of access to his uplands, and to trespass upon or injure his two-acre tract under water, which he held by grant from the state. But the most important of plaintiff's claims for damages were for injury to his alleged exclusive right of fishery and of gathering ice opposite his uplands. The court held that he had no such rights except as to the two-acre tract under water. The plaintiff gave no evidence by which to measure his damages as to the two acres under water, exclusive of his alleged fishing and ice-gathering rights along the other portion of his water front. This appeal requires us to determine whether he has any such rights, and, if so, what is their character, and by what tenure does he hold them?

1. As to his claim of the exclusive right to take fish from the river immediately in front of his upland,—a right technically termed a several fishery: The evidence is to the effect that this part of the river had been from time immemorial, until the alleged acts of the defendant, a productive and profitable fishing field. The plaintiff claims title by grant to the exclusive right of fishing therein. He deduces title from Andries Pieters Coeymans, to whom the governor general of the province of New York, in 1714, made a grant confirming earlier Indian grant made to Andries' father, Barent Pieters Coeymans, prior to 1673, and in that year confirmed to Barent by grant of the governor general. The tract, as first granted, or a part apparently embraced part of the manor of Rensselaerwyck, and boundaries were vaguely defined. It appears from the recitals in confirmatory deed of 1714 that Barent and his son, Andries, in and Killian Van Rensselaer, proprietor of the manor, amicably settled the boundaries between their respective lands, and Van Rensselaer released to them all his right, title, and privileges in and land south of the manor boundary as adjusted, describing it "parcel of land situate on the west side of Hudson's river, * beginning on the bank or shore of the said river, and to extend from the said river into the woods," and by various courses until boundary comes back "to the river." This includes no part of of the river. But these words follow this description: "Together with, all and singular, * * * waters, water courses, fisheries * * * easements, hereditaments, and appurtenances whatever to the said tract, * * * or any part * * * thereof, belonging or in any way appertaining." Whether the release thus

recited did any more than mark the true boundaries, is not clear. The confirmatory deed of 1714, after making the foregoing recital, confirms the title in Andries, son and heir of Barent, describing the land as "beginning at a certain creek  *  *  *  called 'Peter Bronks' Creek,' including the same creek  *  *  *  on the west side of Hudson's river; thence up along said river as it runs, to a brook;  *  *  * thence from the said river backwards up into the woods west,  *  *  * being the northern bounds of said land, the southern bounds beginning at the mouth of Peter Bronks, his creek," and, running back into the woods the same distance, the western extremities of the northerly and southerly bounds are then connected by the westerly boundary; "the easterly bounds thereof is the said Hudson's river." This description includes no part of the river. People v. Page, 39 App. Div. 110, 56 N. Y. Supp. 834, and 58 N. Y. Supp. 239. Following the description are the words, "Together with, all and singular, *  *  *  ponds, pools, waters, water courses, and streams of water, fishing,  *  *  *  within the limits and bounds aforesaid." See Sage v. Mayor, etc., 154 N. Y. 61, 69, 47 N. E. 1096. It will be seen that where Peter Bronks' creek is mentioned as a boundary the words follow, "including the same creek." This deed, by its terms, does not include any exclusive grant of fishing in the river, but rather refers to the fishing in the creeks and other waters "within the limits and bounds aforesaid"; that is, of the grant. The right of fishery in navigable or tide waters, says Kent (3 Comm. 418),—stating what seems to have been the law always,—is a common right; and, if one or more individuals set up an exclusive right to a free or several fishery, it must be clearly shown by prescription or positive grant. Our courts have upheld the grants by the crown of land under water, together with the right of exclusive fishing therein; that is, within the limits of the land granted. Rogers v. Jones, 1 Wend. 237; Trustees of Brookhaven v. Strong, 60 N. Y. 72; Hand v. Newton, 92 N. Y. 89; Robins v. Ackerly, 91 N. Y. 98; People v. Lowndes, 130 N. Y. 455, 29 N. E. 751. In fresh-water streams unnavigable except for small craft, like the Salmon river (in Hooker v. Cummings, 20 Johns. 90), where each riparian proprietor owns to the center of the stream, and not merely to high-water mark, as in the case of the Hudson river (Smith v. City of Rochester, 92 N. Y. 463; Wheeler v. Spinola, 54 N. Y. 377; Roberts v. Baumgarten, 110 N. Y. 380, 18 N. E. 96; Sage v. Mayor, etc., 154 N. Y. 61, 47 N. E. 1096), such proprietor has prima facie the exclusive right of fishing in his own part thereof, subject to the public use of the stream as a highway, if it be fit for such use. The plaintiff has the exclusive right to stand on his own soil, and cast his lines or nets into the river, just as he has the exclusive right to stand there and shoot at the wild ducks which alight in the river within gunshot range of his land; but he has no more right to the fish than he has to the ducks until he captures them, and he has no cause of action against whoever scares the fish or fowl away. A distinction exists in respect of oysters which one plants in a marked-off bed in such a way as not to interfere with navigation or public fishing. The oyster is thus captured and subjected to private ownership. Fleet v. Hegeman, 14 Wend. 42. Public grants of public privileges must be

construed most strongly against the grantee. People v. New York & S. I. F. Co., 68 N. Y. 71. We do not think this grant conveyed any exclusive right of fishery in the river to the grantee.

2. The plaintiff contends that the evidence adduced by him for the purpose of showing that he and his grantors had acquired by prescription the exclusive right of fishing immediately in front of his premises, should have been submitted to the jury. We think not. That a prescriptive right to a several fishery can be acquired in navigable waters is recognized in the cases cited, although not necessary to the decision therein made. Those cases rested upon actual grants. In Jacobson v. Fountain, 2 Johns. 170, the right by prescription was sustained, the plaintiff proving sole and exclusive possession for many years, and also that two of the defendants had recognized his title by paying him for the privilege of fishing. In Gould v. James, 6 Cow. 369, the court said every presumption of a prescriptive right is against the plaintiff. In Trustees of Brookhaven v. Strong, supra, the court said, after expressing some doubt whether the king could grant the exclusive right of fishery in navigable streams, and commenting upon the evidence tending to show that the right of the plaintiff had long been disputed, that:

"In all cases of contest the right of the town was maintained, and has been continuously exercised in various ways,—by exacting payment for individual privileges, or by leasing the land, or otherwise. * * * This long user and occupancy, though not a technical bar, under the statute of limitations, on account of the nature of the property, and the necessarily imperfect character of the possession, are sufficient to give the plaintiff the benefit of any presumption which may be legitimately indulged to supply defects, if not a title by prescription."

The Brookhaven Case seems to have been disposed of on the theory that, even if the king had no right to grant the exclusive privilege of fishing in navigable waters, yet since he had exercised the right in that case, and the right had long been maintained and enjoyed, and had been sustained in Rogers v. Jones, supra, and the question had practically ceased to be important, it was better to uphold than to overthrow the alleged right. It is at once perceived that the acquisition of the right by prescription, which presumes some ancient and lost grant, must be difficult to establish. All the more difficult here because we have the original grant to Andries Pieters Coeymans, from whom the plaintiff traces his title, which does not confer the right. Having an ancient title, which does not aid him, can we suppose one less ancient, and lost, which does aid him? Clearly, as quoted above, every presumption is against him. If the crown, in colonial times, could make a grant of a several fishery in navigable waters, such grant, when made, became validated by the state constitution. Article 1, § 17; Trustees of Brookhaven v. Strong, supra. As title by prescription presumes a grant, the prescription necessary to establish such presumption against the crown must have been made while the power of the crown to make the grant was in force. It ceased to exist, according to section 17, art. 1, of the state constitution, October 14, 1775. The state of New York succeeded to the title of the crown and to its powers, except as limited by its constitution or laws (Langdon v. Mayor, etc., 93 N. Y. 129; People v. New York & S. I. F. Co., 68

N. Y. 71), but it could not make a grant of lands, or of anything issuing out of lands, except in pursuance of law.  We have a statute for the propagation and protection of fish in the various waters of the state, and the regulation of fishing,—the fisheries, game, and forest law (chapter 488, Laws 1892).  The statute proceeds upon the theory that, except as regulated, fishing is free to all who can go fishing without trespassing upon private lands, except that, as to shell fish, private ownership in public waters may exist, and the state may lease privileges.  See People v. Doxtater, 75 Hun, 472, 27 N. Y. Supp. 481, affirmed 147 N. Y. 723, 42 N. E. 724.  Except as to shell fish, there does not appear to be any statute authorizing the lease or grant of the privilege of fishing in the navigable waters of the state.  It follows that what the state is not authorized to grant cannot be presumed by any exclusive use to have been granted by the state.  Ice Co. v. Shultz, 116 N. Y. 382, 22 N. E. 564; Burbank v. Fay, 65 N. Y. 57.  As intimated in Trustees of Brookhaven v. Strong, the nature of the plaintiff's claim to an exclusive right of fishery in the Hudson river opposite his uplands is not such as to constitute an adverse possession, within Code Civ. Proc. §§ 362–372.  The maxim, "Nullus tempus occurrit regi," is not here abridged by the provisions of the Code, and it seems peculiarly appropriate to the circumstances.  The plaintiff's claim is not to the land, but to what may come because of the land,—an incorporeal hereditament, which Blackstone classifies as a franchise.  2 Bl. Comm. 39.  It manifestly is a franchise if it is a private, exclusive monopoly of a public right.  It is an easement if it is the servitude which the servient tenement, the river, must yield to the dominant tenement, the upland.  Under our state constitution, no franchise can be granted except to promote the public welfare.  Article 3, § 18.  To grant to one person the exclusive right of fishing in any part of the Hudson river would be to deprive without due process of law every other person of his privilege of fishing there.  The nature of the title of the state to the river does not admit of its subjection to a perpetual unconditional easement in favor of the upland.  But, starting with the presumption that the right of fishing in the navigable part of the river is common to all, then the plaintiff is met with the difficulty that every time he and his grantors fished in these waters they simply exercised a right common to all, and in subordination to the legal title of the state (Code, § 368); that every time any one else fished therein he did so of like common right.  If the plaintiff excluded any fisherman from these waters, that might be notice to such fisherman, but it would not be notice to the state.  The state should not be presumed to have lost its title unless the circumstances charged it with notice of the necessity of protecting it.  As it is said in Sage v. Mayor, etc., 154 N. Y., at page 79, and 47 N. E., at page 1101:

"Although, as against individuals, or the unorganized public, riparian owners have special rights to the tideway that are recognized and protected by law, as against the general public, as organized and represented by government, they have no rights that do not yield to commercial necessities, except the right of pre-emption when conferred by statute, and the right to wharfage when protected by a grant and covenant on the part of the state."

The plaintiff's evidence of his exclusive user of these waters for fishing was to the effect that he and his grantors, and those whom he or they permitted, were, in the main, the only persons who fished there, but occasionally others would attempt to fish there, but did not in fact do any fishing when plaintiff's or his grantors' nets were out. Once his grantor sued a person because he fished there. What became of the suit does not appear. The plaintiff once forbade one Lynch from depositing dredged material there, and he desisted. Fifty years ago plaintiff's grantor ordered a fishing party away, and they left. This and other evidence tended to show that the plaintiff and his grantors for 50 years claimed the exclusive right of fishing in these waters, and that, in the main, his neighbors respected the claim. We do not think these facts affect the state. Every act shown asserting the right of exclusive fishing was as "unstable as water," and left no mark to warn the state of the plaintiff's claim. Ice Co. v. Shultz, 41 Hun, 458, affirmed 116 N. Y. 382, 22 N. E. 564. The plaintiff, being destitute of any title to the fishery, has no better right than any other citizen to recover damages for its injury; that is, no right at all.

3. As to the plaintiff's right to take ice: The owners of the waters of a mill pond own the ice formed upon it. The owner of the bed of a stream owns the ice within it. Myer v. Whitaker, 55 How. Prac. 376; Swan v. Goff, 39 App. Div. 95, 56 N. Y. Supp. 690. The state owns the Hudson river, in trust for the use of the public. Apart from the statute about to be considered, the ice formed upon it, like the fish within it, becomes the property of the captor who first peacefully seizes it. Chapter 388, Laws 1879, provides that the "owners or occupants of lands and ice houses" on the Hudson river have the exclusive right of gathering ice formed on the river adjacent to the lands and ice houses so owned or occupied by them, after certain acts of appropriation are performed, such as staking out the ice field to be harvested. This is a regulation by the state in favor of the riparian proprietor or occupant, no doubt including the lessee of the owner, as the act, amended by chapter 953, Laws 1895, now provides, of the ice in front of his premises, provided he has an ice house thereon, and gives suitable evidence of his design to gather the ice. Such riparian proprietor or occupant or lessee has the preference. If he cannot or does not exercise it, then he should not prevent others from taking the ice. If what we have already said is correct, this act rightly assumes the title of the state to the ice, and is intended as an equitable regulation for its appropriation, and also as a police regulation to prevent the breach of the peace, liable to occur from private struggles to capture the ice; and thus, so far as it gives to one a privilege which it withholds from another, it does so to promote the public welfare. If it cannot stand upon this ground, it is difficult to see how it can stand at all. No doubt it confers a valuable privilege upon the riparian proprietor, and runs with his land to his lessee. But in 1894, when the defendant committed the acts complained of, the plaintiff had no ice house, and therefore he had no existing ice privileges, but had the privilege of acquiring them thereafter. If the defendant wrongfully impaired the latter privilege, we think it

would be liable therefor. But we have no evidence to enable us to fix the measure of such impairment. The complaint is in tort, and asks for damages, and therefore concedes that there is an adequate remedy at law, and thus limits the plaintiff's damages to the commencement of the action. Uline v. Railroad Co., 101 N. Y. 98, 4 N. E. 536. When, therefore, the trial court directed a verdict for nominal damages, it did so because the amount was not shown in respect of the items for which damages were recoverable; and for this reason the court properly excluded testimony offered by plaintiff tending to show, in bulk, damages for both items, the recoverable and the nonrecoverable.

4. As to the plaintiff's claim for other damages: The trial court, in directing a verdict, said that the government has a right to fill up the water adjoining the plaintiff's land, but not without making just compensation for the damages thereby done to it,—such as the right of access, and the filling up of his two acres under water, and the injury to plaintiff's fishing rights upon said two acres,—but, in the absence of evidence by which to measure such damages, the court was obliged to limit them to six cents. Just compensation was what the plaintiff sought, and, under the ruling of the court, that he recovered, to the extent of his proof of it. No case was made for punitive damages. Millard v. Brown, 35 N. Y. 297.

5. We propose, however, to examine the question whether the acts of the defendant were done under the authority of the United States, and, if so, whether the plaintiff has the right to recover for the consequential damages resulting. Whether it was shown that the improvement of the channel was done by the United States, it was shown that up to 1887 the improvement was carried on by the state, and after that that the federal government began repairs to the dykes, and later on began the dredging of the river. The plaintiff proved by the United States engineer in charge at the time of the trial—October, 1898—that from 1892 to June, 1898, Edwards, Howlett & Thompson were the contractors under the United States for dredging the river between Coxsackie and the state dam at Troy, embracing the locus in quo. Under the war department and chief engineer, pursuant to an act of congress hereafter cited, making an appropriation for that purpose, Edwards, Howlett & Thompson subcontracted the work to the defendant. The bulkhead which extended from about the middle of the plaintiff's front to the westerly dyke of the channel was placed there by the United States in 1889. This bulkhead was known as "Mull's Stone Dyke." Its purpose was to prevent the dredged material deposited above it from washing down stream, and thence into the channel below. Acts Cong. 1892, c. 158 (27 Stat. 88), contains, among other appropriations for the construction, repair, and preservation of rivers and harbors, the following:

"Improving Hudson river, New York, by extension of project of improvement in 1867, so as to provide for a channel 12 feet deep and 400 feet wide from Coxsackie to the foot of Broadway, Troy. * * * $187,500: provided that contracts may be entered into by the secretary of war for such materials and work as may be necessary to carry out the plan recommended by the board engineers U. S. A., dated October 1, 1891, and printed in the house executive document numbered 23, 52d congress, 1st session, for the improvement of the

Hudson river, as above stated, to be paid for as appropriations may from time to time be made by law, not to exceed in the aggregate $2,260,406, exclusive of the amount herein and heretofore appropriated."

The respondents had no contract with the United States, but had a contract with the defendants, Edwards, Howlett & Thompson, made January 28, 1893, wherein it is recited that Edwards, Howlett & Thompson had theretofore submitted proposals for the execution of certain work for the improvement of the navigation of the Hudson river under the direction of the secretary of war of the United States, which proposals were accepted, and contract duly made in accordance therewith, December 23, 1893, and the respondents assumed and agreed to discharge and perform every obligation and part thereof undertaken by said Edwards, Howlett & Thompson. In July, 1893, Edwards, Howlett & Thompson, referring to "our contract with the United States government for the Hudson river improvement," requested, in writing, of the engineer in charge under the United States of the Hudson river improvement, permission to deposit material dredged from the channel of the river above Mull's stone dyke between the channel dyke and the west shore of the river. This request was made in behalf of the respondents. The engineer answered, "This office offers no objection to the proposed disposition of the material, it being understood, however, that the material will be placed behind secure bulkheads, where it cannot be washed back into the channel by current or freshet action." Acts Cong. 1890, c. 907 (26 Stat. 426), forbids any casting of earth or dredged material into any navigable river "which shall tend to obstruct navigation," or in any place "whereby navigation shall or may be impeded or obstructed," provided that when done for "the improvement of navigable waters" it is not unlawful to cast it "into such places and in such manner as may be deemed by the United States officer supervising said improvement most judicious and practicable and for the best interests of such improvements." Thus the test is that the dredged material be cast into a navigable river so as not to impede or obstruct navigation, but, if it shall actually be otherwise cast, pursuant to the direction of the supervising officer in charge, it shall not be unlawful; that is, an error of judgment may happen. There is no evidence to the effect that the deposit of the dredged material in question did in fact obstruct or impede navigation, and therefore there was no need to show that the officer in charge deemed this place of deposit "the most judicious and practicable, and for the best interests of such improvements."

From these facts it cannot be doubted that the improvement was made under contract with the United States government. Wisconsin v. Duluth, 96 U. S. 379. The plaintiff, however, urges that, assuming this to be so, the defendant had no right to deposit the dredged material where it did, and thereby injure the plaintiff's riparian and water rights. Neither the United States, nor the defendant under it, could invade plaintiff's upland without making just compensation. But the plaintiff's rights and property in the bed of the river, including his land under water, rest upon such title as the state could give him, and this is different from his title to his upland. The state

holds the title to the river and its bed as trustee for the public, but, as the river is a national highway (Gibbons v. Ogden, 9 Wheat. 1), the state holds such title subject to the paramount power of congress to regulate commerce with foreign nations and among the states, and thus, as a part of that power, to improve the navigation of the river (Wisconsin v. Duluth, supra; Benner v. Dredging Co., 134 N. Y. 156, 31 N. E. 328). This power embraces every necessary and proper power incidental to its completeness. The excavation of the channel is a necessary and proper part of the improvement. But it has the same power to fill up some portions of the river bed as to dredge out others, since one act may not only be the necessary incident of the other, but necessary and proper to its efficiency. South Carolina v. Georgia, 93 U. S. 4. The power being complete, of course neither the state, nor the plaintiff holding under the state, can call the United States to account for the manner of its exercise, unless it invades some right or property of either not subject to the power. There are many cases touching the riparian rights of individuals upon interstate navigable waters under grants from the state not involving the federal power, and they usually declare such rights, with the reservation that they are subject to the exercise of the federal power. Sage v. Mayor, etc., 154 N. Y. 61, 47 N. E. 1096; Saunders v. Railroad Co., 144 N. Y. 75, 38 N. E. 992; Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. 654; People v. New York & S. I. F. Co., 68 N. Y. 71; Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110; Shively v. Bowlby, 152 U. S. 1, 47, 14 Sup. Ct. 548. Where they do not make the reservation, it must nevertheless be understood. The United States, in making this improvement, has not trenched upon the plaintiff's upland. He does not complain of a trespass upon it, but simply of such consequential injuries to his alleged rights in the river adjoining it as the improvement of navigation has caused. He holds his land under water in the bed of the river and his right to the use of the river, for whatever purpose he may allege, by a title which subjects them to such consequences. This must be so, otherwise his private right to the use of this natural public highway of commerce would be superior to the right of the United States, the sovereign controller of that highway in the interest of all the people, to improve it, except upon paying him for the privilege. From the nature of the case, the trustee of the public rights, whether the state or the nation, could grant him no such rights, except for the public use. If the plaintiff had made any erections in or over the river upon the authority of the state with the consent of the United States, for the public benefit, he would be entitled to compensation for their taking or injury (Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622), but without such authority to stand upon he would have no such right (Newport & C. Bridge Co. v. U. S., 105 U. S. 470). But the plaintiff has made no permanent improvements. He still retains his property. Its usefulness to him is somewhat impaired by the intervention, always reserved, of the paramount public power exercised in the public interests. In Sage v. Mayor, etc., 154 N. Y., at page 79, and 47 N. E., at page 1101, the court in speaking of the riparian rights of the upland owner as against the city and state of New York, said:

"In every grant of land bounded by navigable waters where the tide ebbs and flows, made by the crown or state as trustee for the public, there is reserved by implication the right to so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian proprietor."

When we come to the right of the United States to improve navigation in such waters without making compensation to the riparian proprietor, we do not have to resort to implication. The right to do so flows from the full power conferred upon congress to regulate commerce among the states. It would be less than full if the plaintiff had absolute rights in commercial waters.

The judgment is affirmed, with costs. All concur; MERWIN, J., in result.

LANDON, J. As to the plaintiff's right to costs below: The trial court certified that title to real estate came in question upon the trial, and thereupon, after hearing counsel for both parties, directed that judgment be entered accordingly. The defendant appeals from this portion of the judgment.

The plaintiff recovered six cents. What for? For trespass upon his land under water, and for impairment of his navigable access to his upland. The defendant's appeal as to costs assumes the recovery of damages to be right. As to the plaintiff's right of access, the question in dispute was not as to the ownership of the upland, but whether the plaintiff had the easement of right of way to and from it by water; that is, whether this easement was appurtenant to his land. The court decided this issue in favor of the plaintiff. Such an easement embraces the idea of a dominant and servient tenement; that is, there appertains to the plaintiff's land a right in the state's land. This right is usually called an "incorporeal hereditament," because it is inheritable, but not tangible; is not a part of the adjacent land, but a right to use it for a particular purpose useful to the plaintiff's land. It passes by deed, and is classified as real estate. 3 Kent, Comm. 401, 419, 427; Jones v. Railway Co. (Super. N. Y.) 14 N. Y. Supp. 632; Saunders v. Railroad Co., 144 N. Y. 75, 87, 38 N. E. 992.

The plaintiff also alleged that he owned certain land under water. He did own two acres. His ownership was not practically disputed, but the question was whether it was absolute ownership, or such qualified ownership as precluded him from complaining if the government deposited dredged material on the two acres. If the former, he had full title; if the latter, something less than full title. The real issue, then, was as to his title. The defendant claimed that so much title resided out of the plaintiff as permitted the acts complained of. Hence some title to real estate was in question, within section 3228, Code Civ. Proc.

The order as to costs should be affirmed, with $10 costs. All concur.