[Filed December 10, 1886.]

## SARAH A. SPRINGER v. NANCY YOUNG ET AL.

DONATION LAW—HUSBAND AND WIFE—IMPLIED TRUST.—Where the plaintiff and her husband, after having completed the period of residence and cultivation required by the donation act, sold their donation claim, and the husband invested the proceeds in other lands, taking the title thereof in his own name, and thereafter lived with the plaintiff on said lands up to the time of his death, a period of over twenty years, and during all of said time recognized the plaintiff's right to an undivided half interest in said lands : Held, that the title of the husband in an undivided half of said lands was subject to an implied trust in favor of the plaintiff ; nor did the neglect of the plaintiff during such period to bring a suit to establish her right in the land render it a stale claim.

SAME—ADVERSE POSSESSION.—Possession, to constitute a bar, must be adverse ; and neither a husband nor wife can hold adversely to the other, premises of which they are in the joint occupancy as a family. Adverse possession cannot begin until there has been a disseizin, and to constitute a disseizin there must be an actual expulsion of the true owner for the full period prescribed by the statute.

SAME—SEPARATE ESTATE.—It seems the act of Congress known as the donation law vests in the wife, upon compliance with its terms, a separate estate as to one-half the land claimed. The act not only conveyed to the wife an estate, but capacitated her to hold it in her own right, without the intervention of trustees to prevent the marital rights of the husband from attaching.—Per THAYER, J., concurring.

YAMHILL COUNTY.    Defendants appeal.    Affirmed.

L. Laughary and W. D. Fenton, for Appellants.

H. Hurley, for Respondent.

STRAHAN, J.—This suit is prosecuted by the plaintiff against the defendants, to establish an implied trust in her favor in certain lands situated in Yamhill County.   The defendant Nancy S. Young is the plaintiff's daughter, and C. W. Young is her husband ; May Wilson is also a daughter of the plaintiff, and J. C. Wilson is her husband; and Grace Springer is a minor, a daughter of the plaintiff, and is represented by her guardian ad litem.

It appears from the facts in this case that George W. Springer, in his lifetime, was the husband of the plaintiff, and that they resided together as husband and wife, in Polk County, Oregon, on and prior to June 23d, 1851; and that on that day

said George W. Springer made settlement on 640 acres of un-occupied public lands in Polk County, and now included within the limits of the Grand Ronde Indian Reservation; and that said George W. Springer and the plaintiff, his wife, thereafter continuously resided on and cultivated said land for more than four years next after said settlement; that on the 4th day of October, 1853, the said George W. Springer gave notice to the surveyor general of Oregon of his said settlement upon and cultivation of said lands, in all respects pursuant to the act of September 27th, 1850, commonly called the donation law, and thereby became entitled to 640 acres of land under said act, one half to himself and the other half to his wife; that on the 4th day of March, 1856, General Joel Palmer was superinten-dent of Indian affairs for Oregon; and that, on that day, acting for and in behalf of the United States, he purchased of the said George W. Springer and the plaintiff their said donation land claim, and paid them therefor the sum of $3,750, and that they executed to him a deed for said claim. It also appears that on the 17th day of March, 1856, the said George W. Springer and the plaintiff purchased one of the tracts of land in contro-versy in this suit of C. Comegys, and paid therefor $2.250; being a part of the same money they had received for their said donation claim; and that on the 25th day of April, 1856, they purchased the other parcel in controversy of John Sherwood, and paid therefor the sum of $1,500, being the residue of the sum received from Gen. Palmer by Springer and the plaintiff for their said donation claim.

It further appears that at the time of said purchases, respec-tively, by said Springer and wife last referred to, said Springer managed said business for himself and wife, and took the deeds for said land in his own name, and not in the name of himself and the plaintiff; but thereafter, and up to the time of his death, he recognized the rights of the plaintiff in said land; and it was the understanding between the plaintiff and her said husband that he would convey to the plaintiff an undivided half of said premises at some convenient time thereafter. Dur-ing the lifetime of George W. Springer, and after his death,

the matter was often talked over in the family, and was understood by all the children, six in number; and they have all since conveyed to the plaintiff what would have been their mother's part, if the arrangement between their father and mother had been completed, except the defendants Nancy S. Young and May Wilson.

About the year 1880, George W. Springer was taken suddenly ill, and died in a few days thereafter; since which time the plaintiff has had the possession of all of said premises, except after the appointment of an administrator, using the proceeds for the support of herself and family, and in making some improvements on the farm. During his lifetime, George W. Springer always recognized the rights of the plaintiff in said land, and they appear never to have been controverted or drawn in question until since his death.

A proper solution of the questions discussed by counsel requires that we should first consider the rights of Mrs. Springer in the land in controversy, without regard to and independently of the marital relation which existed between her and her deceased husband. When a conclusion shall have been reached on that point, we can the more readily determine in what manner and to what extent her rights were affected, if at all, by the marriage relation.

We think it is clear that, under the facts in this case, a trust must be implied in favor of the plaintiff. It rests upon principles of equity that have often been recognized in this state, and that are elementary. "Whenever the circumstances are such that a person who takes the legal estate in property cannot also enjoy the beneficial interest without necessarily violating some established principle of equity, the court will immediately raise a constructive trust, and fasten it upon the conscience of the legal owner, so as to convert him into a trustee for the parties who, in equity, are entitled to the beneficial enjoyment." (Willard Eq. 599.) The same author on the same page classes constructive trusts as follows: "First, when the acquisition of the legal *estate* is tainted with fraud, either actual or constructive; and, second, when the trust depends on

some general equitable rule, independently of the existence of fraud."

Mr. Story says: "If a joint purchase is made in the name of one of the purchasers, and the other pays or secures his share of the purchase money, he will be entitled to his share as a resulting trust." (2 Eq. Jur., Sec. 1206.) And so it is laid down by the same author as the established doctrine, without a single exception, and as the result of all the cases, "that the trust of the legal estate, whether freehold, copyhold, or leasehold, whether taken in the names of the purchaser and others jointly, or in the name of others without the purchaser's, whether in one name or several, whether jointly or successively (*successive*), results to the man that had advanced the purchase money." (2 Story Eq. Jur., Sec. 1201.)

Another author, very eminent in this department of the law, speaking of constructive and resulting trusts, says: "They are of two species, 'resulting,' and 'constructive,' which latter are sometimes called trusts *ex maleficio ;* and both of these species are properly described by the generic term implied trusts. Resulting trusts arise when the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty ; but the intent in the theory of equity appears, or is inferred or assumed, from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often contrary to the intention of the one holding the legal title. * * * If one party obtains the legal title to property, not only by fraud, or by violation of the confidence, or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner." (1 Pomeroy Eq. Jur., Sec. 155.)

It must be apparent, that George W. Springer could not have retained the title to this land against the claim of this plaintiff, so far as yet appears ; and if he could not, neither can the defendants, who have or claim no other interest therein than such as descended to them as heirs at law of their father, George W. Springer. They stand in the shoes of their ancestor. They take the title which the law casts upon them, affected with the same trusts and equities as it was when their ancestor held it.

Does the fact that the plaintiff was the wife of George W. Springer during these transactions affect, impair, or destroy the rights which she would have otherwise had in the land in question? It was argued by counsel for the appellants, that George W. Springer received the plaintiff's portion of the purchase price of the donation claim when it was sold, and thereby reduced the same to possession ; and this made the same his own, and cut off all rights of the plaintiff. This assumption relates to a question of fact, and does not appear to be justified by the evidence. The plaintiff testified that she had possession of her half of this money the same as he had his, and I cannot find any controverting evidence in this record. Besides, if the plaintiff only gave this money to her husband to pay over for her for the land in question, then his possession of it was not such as would extinguish her rights. However this may be, there is another and a more serious difficulty in the way of the appellants. On the 20th day of January, 1852, the legislature of Oregon passed an act providing that " all right and interest of the wife in land donated by said act of 27th of September, 1850, should be secured to the sole and separate use and control of the wife; and that she should have to her own use the rents and profits thereof ; and that such land should in no manner be made liable to the debts of her husband." It is true that this act was repealed in 1853, but the effect of the act and of the repeal have both received a construction by this court which is adverse to appellant's claim, and is decisive of this point. (*Linville* v. *Smith*, 6 Or. 202.)

The appellants next insist that the plaintiff's claim or interest in said land is barred by the statute of limitations. Sec. 378 of the Civil Code, as amended (Session Acts, 1878, p. 25), provides: " A suit shall only be commenced within the time limited to commence an action, as provided in title 2 of chapter 1 of this code ; and a suit for the determination of any right or *claim to*, or *interest in* real property, shall be deemed within the limitations provided for actions for the recovery of the possession of real property." This suit falls within this provision of the code, and the same statute that would bar an action for the recovery of the possession of real property will bar this suit. That period is ten years, and is fixed by section 4 of the civil code as amended. (Session Acts, 1878 pp. 21, 22.) But possession, to constitute a bar either at law or in equity, must be adverse. The statute nowhere defines what shall be an adverse possession sufficient to bar an entry. An adverse possession cannot begin until there has been a disseizin, and to constitute a disseizin there must be an actual expulsion of the true owner for the full period prescribed by the statute. An adverse possession is aptly defined by Ingersoll, J., in *Bryan* v. *Aiwater*, 5 Day, to be " a possession not under the legal proprietor, but entered into without his consent, either directly or indirectly given. It is a possession by which he is disseised and ousted of the lands so possessed." To make a possession adverse it must be " an actual, continued, visible, notorious, distinct and *hostile* possession." If its inception was permissive, or with the consent of the true owner, then such possession could never become adverse until some clear, decisive act of the occupant is shown, which would constitute a disseizin of the true owner. (*Hall* v. *Stevens*, 9 Met. 418 ; *Dikeman* v. *Parrish*, 6 Barr. 210 ; *McMasters* v. *Bell*, 2 Pen. & W. 180.)

So, also, if at the time one enters, or afterwards, he does not claim the title himself, but acknowledges the title of another, his possession must be taken as an entry or holding in subordination to the title of the person whose right he acknowledges. (*Rung* v. *Shoneberger*, 2 Watts, 23.)

But we do not think the statute of limitations applies in this case for another reason ; neither husband nor wife can hold adversely to each other, premises of which they are in the joint occupancy as a family. (*Hendricks* v. *Rasson,* 53 Mich. 575.) In such case the possession of neither can be regarded as adverse to the other, while they jointly reside upon and occupy such premises. There is no more reason to claim that Mr. Springer's possession was adverse to the plaintiff, than there would be to maintain that her possession was adverse. The possession of neither was adverse to the other. In such case the law will not subject either husband or wife to a loss of property because such person has not resorted to legal proceedings ; but will rather hold that the possession of each was in subordination to such rights in the property as were possessed by the other party.

Nor is this a *stale claim.* The same reason that would prevent the statute of limitations from running in this case, will save the claim from being *stale.* The plaintiff was not bound to sue her husband. He never denied her right, but always acknowledged it ; and no sufficient reason has been suggested why the plaintiff should be denied the assistance of a court of equity, on the ground that her claim is alleged to be *stale.* The plaintiff's claim is entirely meritorious. It rests on its own merits. It is unaffected by a single act of bad faith. It had its origin in the act of Congress making donations of public lands to the early settlers of Oregon. She endured the hardships of pioneer life to assist her husband in its acquisition. She had done no act to forfeit the right thus acquired, and we have no doubt she is entitled to the relief prayed for. Let the decree be affirmed.

Thayer, J., Concurring.—This appeal is from a decree in equity. The suit in the court below originated out of family difficulty. The respondent, who is quite an old lady, claimed to own a trust estate in a five hundred and twenty acre farm in Yamhill County, and two of her daughters, who are married women, denied the ownership. Thereupon the respondent

commenced the suit, to have a trust in her favor declared in an undivided half of the farm. . She claims that her husband, Geo. W. Springer, late of said county, deceased, and herself, owned a donation land claim, under the donation law of Oregon, situated in Polk County ; that they sold it in the year 1856, for the sum of three thousand seven hundred and fifty dollars, and invested the proceeds in said farm, under an agreement between themselves that each should own one half thereof ; that the deed was taken in the husband's name as a matter of convenience, but that he agreed at the time to convey an undivided one half of it to her, and had, during all his life thereafter, recognized her right to such half; that they lived upon and cultivated the farm, reared a large family ; and that in 1880, the husband was taken suddenly ill, and only lived a few days thereafter. All the children, except the two daughters, recognized the respondent's right in the premises, and joined in a conveyance to her of a one half of the farm, but the deed was to the north half of it in severalty. There is no dispute as to the ownership of the respondent and her husband of the donation claim, nor of the sale and investment of the proceeds thereof in the farm ; though some question is made in regard to the status of their title to the claim at the time of the sale, and it is denied that there was any agreement between them that respondent was to have a half interest in the farm.

The appellants' counsel claim, that upon the sale of the donation right, the money realized therefrom came into the hands of the husband, was personal property, and he became the absolute owner thereof by virtue of his marital rights as then existing ; and that, therefore, no funds of the respondent went into the farm, and consequently no resulting trust could have arisen in her favor ; and that if there had been such an agreement between the respondent and her husband, as claimed by her, the statute of limitations had cut off her right to claim any interest in the farm ; and that in any view, she was barred by lapse of time from asserting her pretended claim.

It seems to me that an unprejudiced person would look upon this defense, under the circumstances of the case, as very un-

gracious, and one that a court of equity would not regard with favor. I am unable to discover why, if the respondent and her husband owned the donation claim, and invested the proceeds arising from a sale of it in the farm, the respondent should not be entitled to a half interest in the latter, as a matter of right and justice. Her title to a half interest in the donation claim was as undoubted as that of her husband; it was given to her by the act of Congress, of September 27, 1850, "to be held by her in her own right"; and to hold that a sale of it, and the purchase of the farm with the proceeds, operated against her will to forfeit to the husband her interest in the matter would, as I view it, be an attempt to legalize robbery. The act of Congress referred to granted to every white settler residing in the territory of Oregon, three hundred and twenty acres of land, if a single man; and if a married man, six hundred and forty acres, one half to himself and the other half to his wife, to be held by her in her own right.

This act always seemed to me to vest in the wife, upon compliance with its terms, a separate estate. That the grant had a double operation. It not only conveyed to the wife an estate, but it capacitated her to hold it in her own right, without the intervention of trustees to prevent the marital rights of the husband from attaching. It was a law, as well as a grant, and it precluded by its terms the husband from interfering with the land granted, or with the proceeds in the event she sold it. It stood upon a different footing from that of real property conveyed to a married woman at common law. There, in order to prevent the marital rights of the husband from attaching, it had to be conveyed to trustees for her use. It was not in the power of a private party to impress upon the property conveyed directly to a married woman, such a character of trust as would relieve it from the operation of the rules of the common law; but the Congress of the United States has power under the constitution to make all needful rules and regulations respecting the territory and other property belonging to the United States. It had power at the time of the passage of the donation act to legislate in the then territory of Oregon,

in regard to persons and property therein; and when it enacted the law giving to a married woman land to be held by her in her own right, it certainly did not intend that the husband could appropriate its use, or convert the proceeds arising from a sale of it without her consent; nor that unfilial children should be able to deprive her of its benefits through the instrumentality of an obsolete rule found among the dusty cobwebs of the common law. In granting the public lands, Congress has a right to annex to the grant such conditions and qualifications as it may deem proper, and exempt the land granted from the operation of existing general laws. Thus, the act entitled "an Act to secure homesteads to actual settlers on the public domain," approved May 20, 1862, exempted such homesteads from liability for debts contracted prior to the issuing of the patent; and the provision has been enforced by this court. (*Clark* v. *Bayley*, 5 Or. 343.) The effect of the latter act was to restrict the laws of Oregon in regard to the liability of property to execution. And the former act in the same way curtailed the marital rights of a husband to his wife's half of a donation land claim. He might probably succeed upon her death to an estate as tenant by the courtesy in it, under the statutes of the state, but did not have what was termed at common law an estate *jure uxoris* in her half of the claim.

Under this view it would only require slight evidence, if any, beyond the fact that the proceeds from the sale of the donation claim were invested in the farm, to establish that the respondent was owner of the trust estate therein, as claimed in her complaint. That there was an understanding that she was to have an undivided half interest in the farm is very certain, if any credit whatever is to be given to the testimony taken in the case and read at the hearing. It is so natural and just that such should have been the understanding between the respondent and her husband, that I am not inclined to question the sufficiency of the proof upon that point, although it merely depends upon the respondent's evidence alone.

Nor do I believe that the trust is affected by the statute of limitations, any more than the legal title would have been under

XIV. Oreg.—19.

the circumstances, if it had been conveyed to the respondent immediately after the purchase of the farm. The appellants in the latter case could as effectually have interposed as they can now. The respondent's right was not denied by her husband. He always, up to the time of his last sickness, she says, recognized it. Both parties were living upon the farm as husband and wife, enjoying its benefits; and the latter, as long as she had entire confidence in the former, had no occasion to exact from him a conveyance. It seems to me that in such a case it would require some overt act on the part of the husband to set the statute in motion; that it would not begin to run until the respondent was excluded from an enjoyment of the farm, or her claim to an undivided half interest in it were denied by the husband.

For the same reason, the defense that the respondent's claim is barred, on account of the lapse of time that intervened between the time it accrued and of the attempt to enforce it, is not sustained. I am of the opinion, therefore, that the decree appealed from should be affirmed.