Argued June 20, decided December 17, 1907; rehearing denied August 4, 1908.

## *HUME *v*. ROGUE RIVER PACKING CO.

[83 Pac. 391; 92 Pac. 1065; 96 Pac. 865.]

APPEAL—RECORD—TRANSCRIPT—IDENTIFICATION OF EVIDENCE.

1. B. & C. Comp., Section 827, providing that, when an equity case has proceeded to final decree, the judge shall within 10 days after the entry of the decree identify the evidence by a proper certificate, is not mandatory; and where there is some confusion touching the evidence, exhibits, and documents proper to be brought to the Supreme Court with the transcript, a motion to strike such evidence, etc., because not identified by the judge, will be granted, with permission to appellant to apply to the judge for a proper certificate.

SAME—MOTION TO STRIKE EVIDENCE—DISPOSITION.

2. Where it will require an extended survey of all the voluminous evidence brought up on appeal in an equity case to determine what is proper and what is not proper, a motion to strike from the transcript evidence, documents, and exhibits which were not introduced on the trial, will be left undetermined until the cause is heard upon its merits.

SAME—MOTION TO STRIKE STIPULATION.

3. The consideration of a motion to strike a stipulation from a transcript will be postponed until final hearing, where the court is unable to determine

*NOTE.—The following opinions are officially reported in this volume, as they are deemed of sufficient importance to justify their publication out of their regular order: Hume *v*. Rogue River Packing Co.; Watts *v*. Spencer; Williams *v*. Altnow; Davis *v*. Chamberlain; Hough *v*, Porter, and Sanborn *v*. Fitzpatrick.    REPORTER.

from the information before it at the time the motion is made, the propriety of striking such stipulation.

NAVIGABLE WATERS—LANDS UNDER WATER—OWNERSHIP—FISH.

4. Where the gradual shifting of a river submerged that part of a shore to which plaintiff claimed title by purchase from the State as tide land, the title to such land became revested in the State, and plaintiff had no dominion over the water covering such land or the fish in it.

FISH—"FISHERY"—"FISHING PLACE."

5. A fishery, which is a right to employ within a particular stretch of water lawful means for the taking of fish which may be found there, is to be distinguished from a fishing place, which is the right to use a particular shore or beach as a basis for carrying on the business, and is always vested in the shore owner.

SAME—FISHERY—NATURE OF PROPERTY.

6. A fishery is real and not personal property—a part of the soil—and not an entity having an independent existence.

SAME—FISHERY ON LAND OF ANOTHER

7. A fishery, so far as it is exercised on another's land, is a *profit a prendre*, and cannot therefore be claimed by way of easement.

SAME—PRIVATE RIGHT OF FISHERY IN PUBLIC WATER.

8. Where a mere right of fishery in public water has been conferred by the sovereign, it will not be regarded as exclusive, in the absence of anything to indicate an intention to make it exclusive, although the title to the soil is also in the grantor.

SAME—RIGHTS OF PUBLIC.

9. Rogue River being a navigable stream, all the rights at common law incident to navigable waters attach, and hence it is a public highway, where all the people of common right may go, and *prima facie* have a common right to fish.

NAVIGABLE WATERS—LANDS UNDER WATER—OWNERSHIP AND CONTROL IN GENERAL.

10. By virtue of its sovereignty, the State, upon its admission into the Union, became vested with the title to all of the shores and arms of the sea, covered and uncovered by the ebb and flow of the tide, as well as the land under all of the navigable waters within the State, subject to the public right of navigation and to the common right of the citizens of the State to fish therein.

SAME.

11. The right of the several states to regulate and control the shores of tide waters and the land under them, is the same as that exercised by the Crown of England.

SAME—RIPARIAN RIGHTS.

12. By the laws of this State, the owner of uplands bordering on navigable water has no title in the adjoining lands below high-water mark, nor any right in or over the adjoining waters as appurtenant thereto; and hence plaintiff's title to the uplands adjacent to that part of Rogue River above tide water runs only to ordinary high-water mark, and cannot be made the basis of an exclusive right to fish in its waters.

FISH—FISHERIES IN PUBLIC WATERS—GRANTS OF TIDE LANDS—RIGHT OF FISHERY AS APPURTENANT.

13. Tide land deeds from the State under the tide land act of 1872 (Laws 1872, p. 129), as amended by the acts of 1874 (Laws 1874, p. 76), 1876 (Laws 1876 p. 69), and 1878 (Laws 1878, p. 41), which provides that the grantee shall hold the lands

subject to the easement of the public to enter thereupon and remove, under certain provisions, oysters and other shell fish therefrom, do not, under the rule *expressio unius est exclusio alterius*, convey the exclusive right of catching floating fish as appurtenant to the lands granted, since the right to use the oyster beds would have remained in the public irrespective of the reservation; and a conveyance of the exclusive right to catch floating fish, being in derogation of a public right, will not be presumed unless clear and special words are used to denote it.

SAME—EXCLUSIVE PRIVATE RIGHT OF FISHERY—ESTABLISHMENT BY CUSTOM.

14. A custom among fishermen along a river, to the effect that the shore owner has the exclusive right to fish to the middle of the stream opposite his land, especially where he has cleared out a place in the bed of the stream for seining, does not entitle such owner to a several fishery within the limits prescribed, since clearing out a fishing place, whether in navigable waters or nonnavigable waters, does not give an exclusive right of fishing, and right to take fish in another's fishery, being a *profit a prendre*, cannot be claimed by custom.

EASEMENTS—ACQUISITION BY PRESCRIPTION.

15. The use and enjoyment which will give title by prescription to an easement or other incorporeal right, is substantially the same in quality and characteristics as the adverse possession which will give title to real estate.

SAME—HOSTILE CHARACTER OF ACTS RELIED ON—GROUND OF ACTION.

16. To constitute adverse user, the acts relied upon in maintenance of a prescriptive right must have been an invasion of the rights of the party against whom it is set up, and of such character as to afford him grounds of action.

FISH—PRIVATE RIGHT OF FISHERY IN PUBLIC WATERS—ACQUISITION BY PRESCRIPTION.

17. Where the owner of lands adjacent to the waters of Rogue River had long been alone in exercising the right to fish therein with seines and nets, such exercise is not adverse to any one in the sense of establishing a prescriptive right, since it did not necessarily prevent other citizens from exercising the same right during the alleged prescriptive period.

SAME—INTENT TO ACQUIRE TITLE.

18. The mere fact that an owner of lands adjacent to Rogue River warned intending fishermen away from the waters opposite his lands, is not sufficient to constitute adverse possession of the right to fish in such waters, since the intent upon which adverse possession is founded is determined by what was done, not by what was said, and such warning to some fishermen would not be a notice to others, much less a notice to the State.

SAME—HOSTILE CHARACTER OF ACTS.

19. No private right to participate in a fishery can be acquired by an exercise of a public right, though enjoyed for 50 years, since such exercise is not based on a claim inimical to the right of others, and does not afford any one grounds of action to question the assumed right.

ADVERSE POSSESSION—NATURE OF PRESCRIPTION—PRESUMPTION OF GRANT.

20. Prescription rests on the presumption of a grant which has been lost by process of time, and hence no prescription can have a legal origin where no grant could have been made to support it.

CONSTITUTIONAL LAW—SPECIAL PRIVILEGES OR IMMUNITIES—GRANT OF EXCLUSIVE RIGHT OF FISHERY IN NAVIGABLE WATERS.

21. The act of February 17, 1899 (Acts 1899, p. 72, § 2), which provides that the ‘ wners of tide lands and riparian owners above tide water on certain

o

rivers, as appurtenances thereto, shall have the exclusive right of fishing for salmon with seines and nets, etc., in so far as it attempts to vest in such owners the exclusive right to fish in navigable waters, is in violation of Const., Or., Article 1, Section 20, providing that "no law shall be passed granting to any citizen privileges or immunities which upon the same terms shall not legally belong to all citizens," in that it grants a monopoly in a lawful and uninjurious business, which may be conducted as of common right.

From Curry: JAMES W. HAMILTON, Judge.

Suit by R. D. Hume to establish the exclusive right to take salmon fish in certain parts of Rogue River. From a decree dismissing the complaint, the plaintiff appeals.

Motion to strike out certain matters from the transcript was allowed in part.

MOTION ALLOWED IN PART: AFFIRMED.

Decided December 4, 1905.

ON MOTION TO STRIKE.

[83 Pac. 391.]

*Mr. M. G. Munly* and *Mr. John F. Hall* for the motion.
*Mr. Robert H. Countryman* and *Mr. William C. Hale* contra.

PER CURIAM. The respondents seek by motion to have stricken from the transcript and files of this court in the above cause the testimony, exhibits and documentary evidence accompanying such transcript, assigning as grounds therefor: (1) That such testimony, documentary evidence and exhibits were not identified by the trial judge rendering the decree, as the law requires; (2) that such testimony, etc., are not certified as required by rule 1 of this court; and (3) that there appears to be incorporated with such testimony the evidence of witnesses, including documents and exhibits, which was never given or admitted at the trial of the cause. The respondents also seek by a further motion, filed at the same time, to have stricken from the transcript a stipulation, entered into between counsel for the parties, touching certain evidence it was desired to have admitted in the cause.

1. Referring to the first motion, the statute provides that "when an equity cause has gone to a final decree, the judge of the court rendering the decree shall, within ten days after the entry of the decree, by a proper certificate, identify all the evidence in the case, whether consisting of the testimony of the witnesses, documentary evidence or exhibits": B. & C. Comp. § 827. We have not regarded this statute as mandatory (*Osgood* v. *Osgood,* 35 Or. 6: 56 Pac. 1017), and, there appearing to be some confusion touching the evidence, exhibits and documents proper to be brought to this court with the transcript, the motion will be allowed, with permission to the appellant to apply to the trial judge for the proper certificate respecting such testimony, etc., and for this sixty days' time will be given. The certificate of the clerk can also be obtained within the time, if deemed important.

2. As it pertains to the third ground, it will require an extended survey of all the evidence brought here, which is very voluminous, to determine what is proper and what is not. Hence it is deemed advisable, the cause being in equity, to leave the matter unsettled until the same is heard upon its merits.

3. Referring to the further motion, we are unable to determine with the information before us touching the propriety of striking out such stipulations. Hence this matter will also be postponed until the final hearing of the cause, with leave to renew the motion then.

The order will be entered in accordance with this opinion.                   MOTION ALLOWED IN PART.

---

Decided December 17, 1907.

## ON THE MERITS.

[92 Pac. 1065.]

Opinion by MR. COMMISSIONER SLATER.

Plaintiff, who is a citizen of this state, seeks to establish by this suit a private and exclusive right to take

salmon fish with seines and nets in the waters of Rogue River from its mouth, where it enters the Pacific Ocean, and extending up the river for a distance of about eighteen miles, and by virtue of his alleged rights he petitions that the defendants be perpetually enjoined from fishing therein with seines and nets for salmon fish. His claim is based on (1) grant, (2) custom and usage, and (3) prescription. The defense is that Rogue River is a navigable stream, within the limits of the free or several fishery claimed by plaintiff, wherein all the citizens of this state, of which class defendants are, have a free and common right to fish in any manner not prohibited by the laws of this state; that plaintiff has no grant from this state of a several fishery, and that it is not within the power of the state to grant such a right; that such right could not be acquired by an individual by custom or usage; that the facts upon which plaintiff predicates his right by prescription are not sufficient to establish it, and, if they were, such right cannot be thus acquired, because a prescriptive right presupposes a grant, and where a thing cannot be granted it cannot be prescribed for.

4. Rogue River is affected by the tides for a distance of from four to five miles from its mouth, and is navigable in fact for several miles above tide water, and also above the limits of the alleged fishery. Plaintiff is the owner, by grant from the state, either directly to himself or by mesne conveyance from others, of all the tide lands bordering on the river, excepting one small fraction, which is unimportant, as well as of all the uplands adjacent to the river above tide water, by conveyances from the United States, which run by description to meander lines. He has no title by express grant from the state to any part of the bed of the stream as such, but he does claim title to the entire bed of the stream at the mouth of the river, where by reason of the shifting of the channel of the river from north to

south, and vice versa, and by successive purchases from the state as tide land of the uncovered sands on both sides of the river, his deeds overlap, and apparently, at least, he is, at that point of the river, the owner of the bed of the stream; but this fact, we apprehend, will be of no avail in support of his claim of ownership of the water when flowing over such land, for in any event he could acquire no greater rights thereby than would be given the ordinary and legal effect of such deed by virtue of the statute authorizing its execution and delivery. But when that part of the shore to which plaintiff claimed title as tide land by deed from the state became submerged by the gradual shifting of the river, he lost all title thereto, and it became revested in the state: *Wilson* v. *Shiveley,* 11 Or. 215 (4 Pac. 324). He is powerless, therefore, to claim any dominion over the water covering such land or the fish that may be in it by reason of his former title, for that is gone from him.

"There is in all such cases," says Mr. Justice Lord, in that case "where land is thus situated and contiguous to the sea, as the court say in *Trustees, etc., Town East Hampton* v. *Kirk,* 84 N. Y. 218 (38 Am. Rep. 505), the possibility of gain or loss to which all riparian owners are subject. They would be entitled to whatever should be gained from the sea by alluvion or dereliction, and their title was liable to be lost by the advance of high-water mark, so as to bring the strip reserved within the ebb and flow of the tide."

So that upon the recession of the water of Rogue River, plaintiff, by reason of his ownership of what was previously tide land thereon, became the owner in the same right of the accretions, and he gained no additional right by securing from the state a deed to the accretions as tide lands.

5. A fishery may be defined as a right to employ within a particular stretch of water lawful means for the taking of fish which may be found there. It is to be distinguished from a fishing place, or the right to use a par-

ticular shore or beach as a basis for carrying on the business. The latter is always vested in the shore owner, and is entirely distinct from the right to fish from the water: *Coolidge* v. *Williams*, 4 Mass. 140.

6. In the case at bar it is admitted by defendants that where plaintiff is the owner of the shore he has the exclusive right to the use of the same for drawing his seines thereon, at least at those places where he has been accustomed to draw his seines, and defendants have not attempted to interfere with his rights at such places. As a right to property, a fishery is real, and not personal, property. It is a part of the soil, and not an entity having an independent existence.

7. So far as it is exercised upon another's land, it is a *profit a prendre: Bingham* v. *Salene*, 15 Or. 208 (14 Pac. 523: 3 Am. St. Rep. 152). Therefore it cannot be claimed by way of easement (*Albright* v. *Cortright*, 64 N. J. Law, 330: 45 Atl. 634: 49 L. R. A. 616: 81 Am. St. Rep. 504; *Cobb* v. *Davenport*, 33 N. J. Law, 223: 97 Am. Dec. 718), and a person fishing by claim of common right can be in no sense the owner of a fishery. As said by Woolrych, quoted by Mr. FARNHAM, at page 1376 of volume 2 of his work on Water and Water Rights:

"When the soil over which the water runs and the water itself belong to the same person, the owner cannot be correctly said to have a right of fishery, because the land and its profits are so completely identified as his inheritance that they cannot be separated. Therefore (continues Mr. FARNHAM) the fishery is included in land and water, and since, in the absence of express reservation, land included water, a grant of land will include both water and fishery. So completely is the fishery identified with the soil, that, if the river changes its course so as to flow upon the land of a stranger, a right of fishery in the river is lost. There is an exception to the rule that the fishery follows the soil in case the soil lies under water in which the public has a right of fishing. In such cases, in order to pass the exclusive right of

fishing, it must be mentioned in the grant, and a mere grant of the soil, without more, will give no right to exclude the public from the enjoyment of its common right; and this exception includes the taking of shell fish from the soil below high-water mark. While the fishery is primarily a part of the soil and will pass with it, both water and fishery may be separated from the soil so as to become a fishery in gross, and the subject of independent conveyance, the same as other classes of property. This rule is as ancient as the Year Books, where it is held that one may have a several fishery in another's land. The water includes the fishery, so that a grant of a parcel of water will include the right of fishery in it. North Carolina has not adhered to the rule that a fishery may be separated from the soil, and has held that there can be no several fishery in a navigable stream, as such a right is an incident of the ownership of the soil, a *locus* which cannot be granted in that state. But the doctrine was not extended to land owned by private individuals, for grants by them of the fishery rights were recognized."

8. Even where a mere right of fishery in public water has been conferred by the sovereign, it will not be regarded as exclusive, in the absence of anything to indicate an intention to make it exclusive, although the title to the soil is also in the grantor: *Moulton* v. *Libbey*, 37 Me. 472 (59 Am. Dec. 57).

The question of what constituted a navigable stream was determined by this court very early in the history of the state in the case of *Weise* v. *Smith*, 3 Or. 445 (8 Am. Rep. 621), where it is said:

"It may be considered the settled law of the United States that so much of the doctrine of the common law of England as made the ebb and flow of the tide a test of navigability is not now applicable in the United States. On the contrary, the maxim of Lord MANS-FIELD, 'out of the fact arises the right,' is applied by the courts of this country"—citing *Morgan* v. *King*, 35 N. Y. 454 (91 Am. Dec. 58); *Jones* v. *Pettibone*, 2 Wis. 308.

9. The evidence herein shows conclusively that Rogue River is navigable in fact for boats of small tonnage for

some distance above the fishery claimed by plaintiff, and is, therefore, a navigable stream in a legal sense as well as in fact; and all the rights at common law incident to navigable waters attach, and by reason thereof it is a public highway, where all the people of common right may go, and *prima facie* have a common right to fish.

10. By virtue of its sovereignty, the state, upon its admission into the Union, became vested with the title to all the shores of the sea and arms of the sea covered and uncovered by the ebb and flow of the tide, usually called tide lands (*Hinman* v. *Warren,* 6 Or. 418; *Bowlby* v. *Shively,* 22 Or. 410: 30 Pac. 154), as well as of the land under all of the navigable waters within the state; subject, however, to the public right of navigation and to the common right of the citizens of the state to fish therein; *Martin* v. *Waddell,* 41 U. S. (16 Pet.) 367 (10 L. Ed. 997); *Shively* v. *Bowlby,* 152 U. S. (45 Davis) 1 (14 Sup. Ct. 548: 38 L. Ed. 331); *Knight* v. *United States Land Assoc.* 142 U. S. 161 (12 Sup. Ct. 258: 35 L. Ed. 974).

11. The right of the several states to regulate and control the shores of tide waters and land under them is conceded, and is the same as that exercised by the Crown of England: *Hardin* v. *Jordan,* 140 U. S. 371 (11 Sup. Ct. 808, 838: 35 L. Ed. 428).

12. By the law of this state, as declared and established by this court, the owner of upland bordering on navigable water has no title in the adjoining lands below high-water mark, nor any rights in or over the adjoining waters as appurtenant thereto: *Hinman* v. *Warren,* 6 Or. 418; *Parker* v. *Taylor,* 7 Or. 435; *Parker* v. *Rogers,* 8 Or. 183; *Shively* v. *Parker,* 9 Or. 500; *McCann* v. *Oregon Ry. Co.* 13 Or. 455 (11 Pac. 236); *Bowlby* v. *Shively,* 22 Or. 410 (30 Pac. 154).

It is apparent, then, that plaintiff's title to the uplands adjacent to that part of Rogue River above tide water, runs only to ordinary high-water mark, and cannot be made the basis of an exclusive right to fish in its waters.

"An exclusive right of fishery in the water adjacent to property," says Mr. Farnham, at Section 375, Vol. 2, of his work on Water and Water Rights, "is not one of the rights of the riparian owner.  He can claim such right only when he owns the soil under the water, or the right has been expressly conferred upon him.  By reason of the location of the riparian owner and his exclusive right to use his land in connection with the fishery, he has certain advantages not common to the public, and in some cases, this will give him a virtual monopoly of the fishery; but the fact that he has the exclusive right to draw a seine on his property does not exclude the public from the right to draw seines if they can do so without trespassing on the shore.  Chief Justice CHOKE said, a long time ago:

" 'If I have land adjoining the sea, so that the sea ebb and flow upon my land, while it flow every one may fish in the sea which has flowed upon my land, for then it is parcel of the sea, and in that sea every one may fish of common right.' "

13. Plaintiff, however, contends that by his tide land deeds from the state, in some of which there is a warranty clause, he has the exclusive right to catch floating fish within the limits of this alleged fishery below and within the tidal waters of Rogue River.  This right is not derived from any expressed grant therein, but is raised by implication from a construction of the tide land act of 1872 (Laws 1872, p. 129) as amended by the acts of 1874 (Laws, 1874, p. 76), 1876 (Laws 1876, p. 69), and 1878 (Laws 1878, p. 41, which contains the following language:

"Nothing in this act shall be construed to prevent the legislature of this state, or the corporate authorities of any city or town thereof, from regulating the building of wharves or other improvements in any bay, harbor or inlet of this state or construed as a grant of the exclusive right to any person or persons, to use the natural oyster beds of this state, but the grantee of any tide lands under this act shall hold the same subject to the easement of the public as provided by the existing laws of this state, to enter thereupon and remove, under the

provisions and restrictions of the laws now in force or which may hereafter be enacted, oysters and other shell fish therefrom."

Having reserved in the act the right to regulate the building of wharves, and also the right of the public to enter upon the tide lands sold and conveyed under the authority conferred by said act by negativing an exclusive right in a grantee, and not having reserved any other or further rights, there can be no doubt, it is said by plaintiff, by way of argument, that it was the intention of the legislature to convey the exclusive right of catching floating fish as appurtenant to the lands granted, applying the maxim *expressio unius est exclusio alterius* to the language of the statute. Some weight might be given to this suggestion, if without such reservation in the statute the exclusive right to use the natural oyster beds would have passed to the grantee. But such is not the law. The language reserves that which the law itself without the statute would have reserved, or rather the law declares that such exclusive right as against the public right shall not be deemed to be included unless it is expressly mentioned. In those states, where it has been conceded that such grant may be made by the state, it has been universally held that, the claim being in derogation of a public right, such grants are strictly construed against the grantee, and an intention to part with any portion of such public right will not be presumed unless clear and special words are used to denote it: *Shively* v. *Bowlby*, 152 U. S. (45 Davis) 1 (14 Sup. Ct. 548: 38 L. Ed. 331) ; *Pacific Steam Whaling Co.* v. *Alaska Packers' Assoc.* 138 Cal. 632 (72 Pac. 161) ; 2 Farnham, Waters, § 1379; 19 Cyc. 994. "A grant of an exclusive right of fishery in a public water is in derogation of common right, and must be expressly mentioned to vest in the grantee. No such right will pass by implication": 2 Farnham, Waters, § 1379. No language being found in plaintiff's deeds from the state which by un-

avoidable construction imports an intention to grant an exclusive right to fish for salmon in the water opposite and adjacent thereto, it follows that he does not have that right by virtue of his tide land deeds. In this connection it is urged by plaintiff that the courts of this state, in construing the various tide land acts, have heretofore uniformly recognized the power of the state to grant an exclusive right to fish, and that all rights possessed by the state over navigable waters, excepting the public right of navigation, would pass by virtue of these tide land deeds. But such inference cannot fairly be drawn from any previous declarations of this court, for these questions have never been involved in any matters passed upon by this court. Plaintiff also relies with a good deal of confidence upon what was said by this court in the case of *Hume* v. *Turner*, 42 Or. 202 (70 Pac. 611). What was said there amounts to no more than a recital of the facts and issues before the lower court, and the relief granted by that court, from which the conclusion was deduced that the plaintiff in that case, who is the plaintiff here, and who had appealed, had obtained by the decree all of the relief asked by him, and for that reason he was not aggrieved by the decree of the trial court. Hence he had no right of appeal, and this court *sua sponte* dismissed the appeal. That is all that was decided or attempted to be decided there. Moreover, as we understand the decree in that case, it went no further than to enjoin the defendants from trespassing upon plaintiff's tide lands, and from putting obstructions in the water fronting his tide lands in any place or places where said lands are used for landing seines by the plaintiff.

14. The second support which plaintiff sets up to maintain his several fishery is a custom said to exist among those engaged in fishing on Rogue River and other navigable rivers along the coast of Oregon, to the effect that the shore owner has the exclusive right to

fish to the middle of the stream opposite his land, especially where he has cleared out a place in the bed of the stream for seining. But the cases generally hold that clearing out a fishing place, whether in navigable or nonnavigable waters, does not give an exclusive right of fishing (13 Am. & Eng. Enc. Law [2 ed.], 584) ; and as to any understanding among fishermen that such rights existed among them, as against each other, and against the public at large, it is declared in *Collins* v. *Banbury,* 27 N. C. 118 (42 Am. Dec. 155), to be a novel and untenable mode of acquiring a several fishery. Custom is said to be applicable to cases where the inhabitants of a particular locality have acquired an easement by long enjoyment, without being capable of taking collectively under deed: 22 Am. & Eng. Enc. Law (2 ed.), 1185. A right to take fish in another's fishery, being a *profit a prendre,* cannot be claimed by custom. The reason for this rule is that, if such custom were allowed, it might and probably would result in the destruction of the subject-matter to which applied: 13 Am. & Eng. Ency. Law (2 ed.), 583. How much more forcible would the reason of the rule apply to the claim of one that he had acquired by custom, as against the owner of the servient tenement, the exclusive right to take fish at a particular place in a river; the entire destruction of the subject-matter of the claim being rendered certain by the very claim itself.

15. Plaintiff's alleged prescriptive right is based upon the claim that he and the former owners of the uplands and tide lands bordering upon and adjacent to the waters of Rogue River, within the limits of his fishery, whose title he now has, have for the past forty or forty-five years exercised and claimed as appurtenant thereto the exclusive right to take salmon in the waters of Rogue River opposite to such lands with seines and nets, and that such right has been conceded and acquiesced in during all of that time by other fishermen and by all of

the inhabitants of that locality.   And to support such claim he shows that he has spent large sums of money in clearing out snags and rocks from the bed of the stream, in order to make seining practicable, and in erecting and establishing on the shore a large establishment for canning fish for commercial purposes, which he has carried on extensively for many years, as well as erecting and successfully operating, at considerable expense to himself, a hatchery for the purpose of renewing and increasing the supply of salmon in the river.   Plaintiff became interested in the fishery about 1877, prior to which time the method of taking fish employed by his predecessors was seines drawn upon the shore at four or five particular places along the river, which were peculiarly favorable for seining; but since that time plaintiff has also employed gill nets, both drifting and set nets.   Fishing with seines was usually carried on from about the middle of July until November, while gill nets were used only in the spring time, from April until July; but no appliances such as weirs, dams, traps, stakes or fish wheels affixed to the soil, were ever used by either plaintiff or his predecessors; and it may be said that the record shows that no one besides plaintiff and his predecessors in interest have ever carried on fishing in Rogue River for commercial purposes to any appreciable extent until the defendants began to fish with drift nets, whose acts are complained of in this suit.   It was admitted by the defendants through their attorneys, by stipulation, that they had drifted with drift gill nets in Rogue River from Bagnell's Ferry, which is four or five miles above the mouth of the river, to the mouth of the river, and that they had caught salmon fish in considerable numbers by such drifting, which was done from August 1 to August 15, 1903.   And the record shows that plaintiff's predecessors never claimed the exclusive right to fish with seines and nets in the entire river, nor anything more than the exclusive right to cast their seines in par-

ticular places, from which they had removed snags, and
to draw their seines upon tide lands which they owned.

M. Riley, of the firm of Riley & Stewart, and a witness
for plaintiff, from whom he deraigns his title, swears
that "We did not object to any one fishing in the river,
if they did not trespass on our tide lands where we were
fishing, where we had fixed our hauling grounds."
He mentions Captain Coughill, who he says came to
Rogue River and fished some; that he brought a schooner
and anchored it in the river, and salted his fish down
in the schooner and took them to San Francisco; that
white men and Indians caught all the fish they wanted
for their own use; nobody objected; that they did not
interfere with any one, except those who trespassed upon
their tide lands. The testimony of T. A. Stewart is to
the same effect, and there is evidence that others at dif-
ferent times have fished in the stream with nets, and in
fact it is conceded by counsel for plaintiff that farmers
in that vicinity annually take fish from Rogue River for
their own use, and that the common right of fishing with
hook and line in Rogue River now exists. The claim
of exclusive right to fish with seines and nets in the river,
now made by plaintiff, seems to have been originated
by him, and not by any of his predecessors. Since plain-
tiff became interested in the business of fishing and can-
ning fish at that place, he has at times objected to
others fishing there, and warned them away, and several
actions have been brought and successfully maintained
by him and his predecessors against persons who have
attempted to take fish with seines; but all of these in-
stances involved a trespass by hauling seines upon the
shore or tide land owned by plaintiff, but never involved
the right to take fish in the stream with drift nets or set
nets without such trespass upon the shore.

The use and enjoyment which will give title by pre-
scription to an easement or other incorporeal right is
substantially the same in quality and characteristics as

the adverse possession which will give title to real estate; that is to say, as respects prescriptive title, it must be adverse, under claim of right, continuous, uninterrupted, open, peaceable, exclusive, and with the full knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period, and while the owner of the servient tenement is under no legal disability to assert his right: 22 Am. & Eng. Enc. Law (2 ed.), 1190.

16. To constitute adverse user, the acts relied upon in maintenance of a prescriptive right must have been an invasion of the rights of the party against whom it is set up, and of such character as to afford him grounds of action: *Wimer v. Simmons*, 27 Or. 1 (39 Pac. 6: 50 Am. St. Rep. 685). Here the right is set up and claimed against the general public, which must include the state, in which the fee was vested for the benefit of all the citizens thereof. Now the character of the use here shown cannot be said to have been an invasion of that right. It was nothing more than the exercise of a right, common to all of the citizens of the state, by plaintiff.

17. The right to take fish in Rogue River with seines and nets plaintiff possessed before and at the time of his user, and the exercise of that right by him cannot be said to be adverse to any one, for its exercise in the manner here shown did not necessarily prevent other citizens from also exercising the same right at any time during the alleged prescriptive period. If the use by plaintiff had been by fencing off, as it were, a portion of the river by stakes or fixed inclosures, or by erecting and attaching to the soil or bed of the stream permanent structures, such as weirs, dams, traps, fish wheels, and such fixtures for the purpose of catching fish, it would, of necessity, have excluded others from fishing in the same place, and to that extent would be adverse. "Fishing, in practice, may be of two kinds, viz.: (1) with nets, hooks, or other movable apparatus; (2) or by

means of weirs, stakes, or fixed inclosures or fishing places. Now, it is obvious that the public right of fishing cannot be carried on by the latter modes, since an inclosure by one person excludes others. Fishing with nets, hooks, etc., may, according to the treatise *De Jure Maris,* be 'either as a liberty without the soil, or arise by reason of or in concomitance with the soil itself and the proprietorship of it.' Now, as the public cannot claim the soil under the sea or of the shore itself, the public fishing of the subject is a floating liberty of fishery with nets, hooks, etc., whereas the several or private fishery may be claimed either as an individual personal right of fishing with nets, hooks, etc., in *loco,* the soil or shore whereof belongs to the king or to any private subject, or it may be claimed as appendant or appurtenant to the ownership of the adjoining manor or freehold. The public fishery and private fishery are incompatible with each other. So, also, is the right to fish with nets, hooks, etc. (movable machinery), incompatible with a fixed fishery. No fishery with nets, hooks, etc., can be enjoyed by the public, or even by one person, in a place where another enjoys a private right to make weirs and inclosures, and yet both of these kinds of fishing may be enjoyed in waters the shore and soil of which belong to another": Moore's Hall, Foreshore & Sea Shore (3 ed.), 720.

18. Wherever the acquirement by prescription of a several fishery has been recognized by the courts, evidence of exclusive possession by inclosure of the soil covered by the waters, or by the use of fixed appliances, such as weirs, traps, etc., which must necessarily exclude the public, seems to have been required. Such is the declaration of Chief Justice SHAW in *Lakeman* v. *Burnham,* 7 Gray, 437, that such proof in general can be made only by showing an actual possession of the flats where the tide ebbs and flows by building thereon or inclosing the same, so as to exclude the access of boats

or vessels. "The statute nowhere defines what shall be an adverse possession sufficient to bar an entry," says Mr. Justice Strahan in *Springer* v. *Young,* 14 Or. 280 (12 Pac. 400). "An adverse possession cannot begin until there has been a disseizin, and to constitute a disseizin there must be an actual expulsion of the true owner for the full period prescribed by the statute. An adverse possession is aptly defined by Ingersol, J., in *Bryan* v. *Atwater,* 5 Day, 181 (5 Am. Dec. 136), to be 'a possession not under the legal proprietor, but entered into without his consent, either directly or indirectly given. It is a possession by which he is disseized and ousted of the lands so possessed.' To make a possession adverse it must be 'an actual, continued, visible, notorious, distinct and hostile possession.' " Can it be said that plaintiff, by exercising his common right of fishing in a lawful manner, and not necessarily incompatible with the common right, has invaded the right of the state or of the people generally, and maintained a hostile possession? Now it is true that plaintiff claims to have warned intending fishermen away, and this is all of his case, as shown here, to indicate any hostile action or claim by him; but the intent upon which adverse possession is founded is to be determined by what was done, not by what was said: *Rowland* v. *Williams,* 23 Or. 515 (32 Pac. 402). Again, what may have been so declared to one citizen would not be notice to others of an adverse claim to their rights, but it is as fleeting and transient as the wind. It certainly would not be notice to the state, whose deputies and water bailiffs cannot be supposed to be present continuously, and observing what is being done and said at each fishing place. But "to effect that result, the possession taken must be open, hostile, and continuous; 'he must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains and planted the standard of conquest' ": *Curtis*

v. *La Grande Water Co.* 20 Or. 34 (23 Pac. 808: 25 Pac. 378: 10 L. R. A. 484).

19. The act of fishing as employed by plaintiff is not adverse, also, because not based on a claim of right inimical to the right of others. No private right to participate in a fishery can be acquired by an exercise of a public right, though for fifty years: *Commonwealth* v. *Weatherhead,* 110 Mass. 175; *Slingerland* v. *International Contracting Co.* 43 App. Div. 215 (60 N. Y. Supp. 12); *Tinicum Fishing Co.* v. *Carter,* 61 Pa. 21 (100 Am. Dec. 597). By the exercise of his public right of fishing, plaintiff has not afforded to any one grounds of action to question his assumed rights. The reasoning of Mr. Justice LONDON in *Slingerland* v. *International Contracting Co.* is much in point here. He there says:

"But starting with the presumption that the right of fishing in the navigable part of the river is common to all, then the plaintiff is met with the difficulty that every time he and his grantors fished in these waters they simply exercised a right common to all, and in subordination to the legal title of the state (Code, § 368); that every time any one else fished therein he did so of like common right. If the plaintiff exclude any fisherman from these waters, that might be notice to such fisherman, but it would not be notice to the state. The state should not be presumed to have lost its title unless the circumstances charged it with notice of the necessity of protecting it. * * The plaintiff's evidence of his exclusive user of these waters for fishing was to the effect that he and his grantors, and those whom he or they permitted, were in the main the only persons who fished there; that occasionally others would attempt to fish there, but did not in fact do any fishing when plaintiff's or his grantor's nets were out. Once his grantor sued a person because he fished there. What became of the suit does not appear. The plaintiff once forbade one Lynch from depositing dredged material there, and he desisted. Fifty years ago plaintiff's grantor ordered a fishing party away, and they left. This and other evidence tended to show that plaintiff and his grantors for

fifty years claimed the exclusive right of fishing in these waters, and that in the main his neighbors respected the claim. We do not think these facts affect the state. Every act shown asserting the right of exclusive fishing was as 'unstable as the water,' and left no mark to warn the state of the plaintiff's claim"—citing *Knickerbocker Ice Co.* v. *Shultz,* 41 Hun, 458; *Knickerbocker Ice Co.* v. *Shultz,* 116 N. Y. 382 (22 N. E. 564).

The latter case holds that the right to navigate the public waters and to fish therein are public rights, belonging to the people at large. In that respect every individual has the same right; that the riparian proprietor cannot interfere with such user by the public, and that should he attempt to so appropriate to his own use the lands under water in front of his premises, and to that end should build thereon, it would constitute a purpresture, which the state could remove.

20. But assuming that the plaintiff here has shown an open, exclusive, continuous, hostile and adverse user with a claim of right, there is still a more potent reason why it would not ripen into a perfect prescriptive title of a several fishery. Such user must be based upon a claim of right, different as we have shown, from his public or common right of fishing; that is to say, it must be based on grant. Prescription rests on the presumption of a grant, which has been lost by process of time. No prescription can have legal origin where no grant could have been made to support it: 2 Blackstone, Com. (Lewis' 2 ed.) 265; *Tinicum Fishing Co.* v. *Carter,* 61 Pa. 21 (100 Am. Dec. 597) ; *Arnold* v. *Mundy,* 6 N. J. Law, 1-67 (10 Am. Dec. 356) ; *Knickerbocker Ice Co.* v. *Shultz,* 116 N. Y. 382 (22 N. E. 564).

21. The title to the bed of all navigable rivers being in the state, and the right to fish therein being subject to its control and supervision, the grant of an exclusive right to fish must come from the state, either by special act or through a general law. But we do not find that

51 Or.— 9

the legislature of this state has ever authorized or empowered by general law any of its officers or agents to convey in the name of the state to any one its title to lands covered by the navigable waters thereof, or particularly any exclusive rights to fish therein; but such general legislation as has been enacted in the exercise of its proprietary rights over navigable waters and the rights of fishing therein, with one exception, appears to have been for the common benefit of all citizens, and not for the particular advantages of any. The exception is an act approved February 17, 1899, upon which plaintiff to some extent relies. The material part of this act is as follows:

"Sec. 2. The owner or owners of tide lands and riparian owners above tide water on each of said rivers (including Rogue River) as appurtenances thereto shall have the exclusive right and privilege of fishing for salmon fish with seines and nets and hauling and landing seines and nets on said lands, and no person or persons shall anchor said nets or put or place any obstruction or obstructions whatever in the water fronting said tide lands in any place or places where said tide lands are used for hauling or landing seines": Laws 1899, p. 72.

This statute apparently grants to the owners of tide lands the exclusive right and privilege of fishing for salmon fish with seines and nets on such lands while covered by the tide, as well as of drawing seines thereon. The first right attempted to be granted by this statute is a part of the *jus publicum* held by the state in trust for the people, and is an addition to the *jus privatum*, which passed from the state to the grantee by the tide land deed; and the second right attempted to be granted is no more than a confirmation of that which the grantee had without the statute. It is not clear from the evidence whether the defendants drifted with their nets over the tide lands of plaintiff while covered with the tide, but from the tenor of the stipulation between the parties, heretofore noticed, it may be inferred that they

did, and therefore it becomes necessary to consider the validity of this statute with reference to its securing to appellant an exclusive right to fish thereon. So far as this act attempted to vest in the upland or tide land owner the exclusive right to fish in the waters of Rogue River, which was formerly enjoyed and possessed by the public as of common right, we are of the opinion that it would be inoperative and void, as coming within the prohibition of Article I, § 20, of the constitution, which provides:

"No law shall be passed granting to any citizen privileges or immunities which upon the same terms shall not equally belong to all citizens."

Construing this section of the constitution in the case of *White* v. *Holman,* 44 Or. 180 (74 Pac. 933), it was held by this court to inhibit the granting of a monopoly in a lawful and uninjurious business, which may be conducted as of common right. The business of fishing is unquestionably lawful and uninjurious, and its exercise in navigable waters is not only a matter of common and public right (Schultes' Aquatic Rights, 16-55: 24 Law Library, 4, 25), but is the right of citizenship and property combined: *McCready* v. *Virginia,* 94 U. S. (4 Otto) 391 (24 L. Ed. 248). Hence the grant to one of an exclusive right to fish would not only create a monopoly in one citizen by taking from others a right of citizenship, but would destroy by the same act a right of property vested in each.

In the case of *Slingerland* v. *International Contracting Co.* 43 App. Div. 215 (60 N. Y. Supp. 12), London, J., says:

"The plaintiff's claim is not to the land, but to what may come because of the land—an incorporeal hereditament—which Blackstone classified as a franchise: 2 Blackstone, Commentaries, 39. It manifestly is a franchise if it is a private exclusive monopoly of a public right. It is an easement if it is the servitude which the servient tenement—the river—must yield to the dominant tene-

ment—the upland. Under our state constitution, it is
doubtful whether any franchise can be granted except to
promote the public welfare: Article III, § 18. To grant
to one person the exclusive right of fishing in any part
of the Hudson River would be to deprive without due
process of law every other person of his privilege of
fishing there. The nature of the title of the state to the
river does not admit of its subjection to a perpetual un-
conditional easement in favor of the upland."

The section of the constitution of New York therein
referred to reads as follows:

"The legislature shall not pass a private or local bill
in any of the following cases * * granting to any pri-
vate corporation, association or individual any exclusive
privilege, immunity or franchise whatever * * ": Rev.
St. N. Y. 1882 (7 ed.), p. 89, Art. III, § 18.

Affirming this case on appeal, Justice GRAY expressly
approves of the opinion of LONDON, J., in the case of
*Slingerland* v. *International Contracting Co.* 43 App.
Div. 215 (60 N. Y. Supp. 12), and adds:

"The state could not grant an exclusive right, and if
there was no authority in law for such a grant, it will
not be implied as the basis of a right by prescription:
*Knickerbocker Ice Co.* v. *Shultz,* 116 N. Y. 382 (22 N. E.
564). He could gain no exclusive title by continuous or
adverse user, for the river was common to all. The title
of the state was in trust for the people, and all rights ex-
ercised in the waters of the river were enjoyed in com-
mon. Fishing in navigable rivers or in arms of the sea
is presumptively common to the public (*Hooker* v. *Cum-
mings,* 20 Johns. 101: 11 Am. Dec. 249), and the pre-
sumption militates necessarily against any title having
been acquired exclusive as to the state and the public":
169 N. Y. 60 (61 N. E. 995: 56 L. R. A. 494).

At an earlier period of the judicial history of that
state its court of last resort discussed to some extent, in
the case of *Matter of Application of Union Ferry Co.*
98 N. Y. 139, the character of the privileges or fran-
chises at which the constitutional prohibition in question
was aimed; citing familiar instances of grants of ex-

clusive privileges or franchises by acts authorizing the establishment of ferries, toll bridges, turnpikes, telegraph lines, and the like. The case of *Slingerland* v. *Internation Contracting Co.* 43 App. Div. 215 (60 N. Y. Supp. 12), is the latest judicial expression in this country on the questions involved, and according to one textwriter, excepting one other case, is the only American case in which the question of a right of several fishery is directly involved and determined. The conclusions therein announced appear to us to be sound and applicable to the case now in hand.

We are of the opinion, therefore, that the grant to a citizen of an exclusive right to fish in a navigable stream, where, *prima facie,* all have a common right to fish, is the creation of a monopoly, which comes within the prohibition of Section 20, Article I of the Constitution of Oregon, which is substantially the same in that respect as that of New York. For this reason, whatever deductions or inferences most favorable to plaintiff may be made from the evidence in this case, his claim of an exclusive right to the fishery in Rogue River must be held to have no legal basis.

The decree of the lower court should be affirmed.

AFFIRMED.

---

Decided August 4, 1908,

ON REHEARING.

[96 Pac. 865.]

PER CURIAM. This case has been carefully re-examined, and we are satisfied with the conclusion heretofore reached.

Petition for rehearing will therefore be overruled.

AFFIRMED: REHEARING DENIED.